# UNITED STATES BANKRUPTCY COURT

In re: Zanub Raza

Docket No. 17-14818-FJB

ROMAN BEYLIN

Plaintiff

v.

ZANUB RAZA

Defendant

**ADVERSARY PROCEEDING** no.

## COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY PURSUANT TO 11 U.S.C. §523

This is a complaint for non-discheargeability pursuant to 11 U.S.C. §§523 and 727(b) for intentional, willful, malicious injury to physical person of Plaintiff, as well to the reputation, earning capacity and of Plaintiff. This Complaint for non-dischargeability sounds largely in tort for the extreme and outrageous conduct that the Defendant has engaged in towards the Plaintiff that has caused Plaintiff emotional harm and damage. In addition, the behavior of Defendant Raza has resulted in the termination of Plaintiff's employment, damaged his career and reputation, invaded his privacy right, and caused a loss of income as a result. Plaintiff Beylin seeks a determination that this debt is non-dischargeable pursuant to 11 U.S.C. §523(a)(6).

## **PARTIES**

1. Plaintiff Roman Beylin ("Beylin") lives in Suffolk County with a principal place of residence located in Boston, Massachusetts;

2. Defendant Raza ("Raza") lives in Suffolk County with a principal place of residence located in Boston, Massachusetts;

## **FACTS COMMON TO ALL COUNTS**

3. Plaintiff Beylin is a young adult who has earned a degree from a well-known university in the Northeast with a background in business;

4. After graduating from college, Beylin commenced his career at Fidelity Investments where over time Beylin moved up the ladder in his career at Fidelity;

5. In or around 2013, Beylin received a new job offer from a firm in the securities industry here in Boston called CLSA Americas to become VP of Institutional Equity Sales in Boston;

6. Beylin then studied for and passed the Securities tests for a Series 7 sales license;

7. Beylin then studied for and passed the Securities tests for a Series 63 sales license;

8. In or around November 2013, Beylin obtained both his Series 7 and Series 63 Securities licenses and then started building client relationships;

9. During this timeframe, Beylin continued to work hard and to build his reputation in the Securities industry;

10. Beylin donated his time to a well-known Boston charitable foundation;

### The Start Of The Relationship With Raza

11. Beylin had met Raza in certain business and social settings over the years and in or around late 2012, the parties again met and exchanged phone numbers;

12. Beylin invited Raza to a number of social and business engagements and after a certain amount of time, the parties started dating;

13. After about two months of dating, while away for the weekend in Connecticut, the Defendant, without permission, knowledge or consent, accessed Plaintiff Beylin's cellphone and data while Beylin not present;

14. As time progressed, Beylin became more and more aware of the behavior of the Defendant Raza concerning jealousy and possessiveness;

15. Throughout the relationship, at the insistence of Raza, Beylin routinely introduced her to all of Beylin's friends, business acquaintances and contacts;

16. Raza had expressed a desire to switch careers and solicited Beylin to introduce her to people within his network who she believed could help her with a career change;

17. In late 2013 Beylin had advanced further in his career and decided to take a new job and went from making a base salary of approximately $80,000 to making approximately $200,000, with, additionally, a realistic expectation of making approximately $300,000 to $400,000 in the next 12-months;

18. With the switch in jobs, Beylin upgraded apartments and lifestyle. At the same time Beylin was working longer hours and more days while spending less and less time with Raza;

19. On many occasions Raza had expressed that she had thought that the high paying job had changed Beylin for the worse and she wished things could be as they were in the past.

20. Raza had become extremely volatile during this period – frequently calling, texting, and exhibiting stalking behavior;

21. In late 2013 or early 2014 Beylin's employer, CLSA Americas had received a letter from FINRA stating that someone (an individual) had called in a complaint about Beylin.

22. Since Beylin dealt with institutional investors and not individual ones, there is no way that the complaint was legitimate;

23. It was always Beylin's fear that the complaint came from Raza as to affect his job negatively;

24. Beylin believed that the motive for the complaint was the change in lifestyle where Beylin couldn't devote as much attention to Raza as he had in the past due to increased work load;

25. In the end of the FINRA investigation, no charges were filed and Beylin's record remained and remains intact and clean;

26. Throughout the late 2013 and early 2014 period Beylin's relationship with Raza had become difficult;

27. Due to the long work hours, Beylin could not spend as much time with her as he had in the past;

28. During this timeframe, she continued to actively access Beylin's phone & iPad while Beylin was not present;

29. Raza would check Beylin's e-mail and browsing;

30. On several occasions, she would reply to random people from Beylin's my e-mail account whom Beylin had met through work and gym, believing that he was cheating on her;

31. Raza continued to exhibit very volatile behavior to the point of stalking Beylin and making Beylin feel threatened and very uncomfortable;

The Surprise Pregnancy

32. In or around March or April of 2014, Raza had informed Beylin that she was pregnant with his child;

33. Beylin attempted to discuss the future and without any input or contribution from Beylin, Raza informed Beylin that she wanted to have the child for herself and that she did not need anything from Beylin—this position was entirely Raza's decision;

34. Feeling entirely left out and unhappy, Beylin stated that the romantic relationship would be over but Beylin agreed in every way to help Raza through the pregnancy;

35. The pregnancy had not been an easy one and she was constantly in and out of the hospital for various procedures, allegedly;

36. Raza had always asked Beylin for help and whenever he could, he would pick her up from the hospital, take care of her and have her stay over Beylin's apartment;

37. Around the middle of April 2014, Beylin had gone out of the country.

38. One day during this trip Beylin received a phone call from Raza informing him that she had gone to the hospital and the doctors could no longer detect any pulse from the pregnancy. She informed Beylin that the pregnancy was over;

39. Beylin knew this was hard on Raza and spent more time with her trying to console and calm her down when Beylin got back from his trip;

40. A few weeks later Raza started experiencing morning sickness and after going to the hospital informed Beylin that she was in fact still pregnant;

41. Over the next few weeks Beylin explained that he would do his best to help Raza with the pregnancy but that he was extremely busy with work as he was often the only one in the office;

42. Beylin also made clear again that the romantic relationship between them was over;

43. At this time, Raza's behavior became more bizarre;

44. She informed virtually every one of Beylin's friends, colleagues and business associates that she was pregnant;

45. Raza engaged in a pattern of harassment; she would repeatedly call Beylin's office up to 20 times all throughout the workday until she got a hold of Beylin;

46. She also started going to the hospital more often and more often requested that Beylin be there;

47. Over the last few months, Beylin was the only one in his work office and responsible for running the CLSA Americas Boston operation; Beylin simply could not be with Raza each time she requested while continuing to do his job at the same time;

48. She continued to be more and more upset at Beylin for not being there for her all the time;

49. Throughout this time Raza called Beylin's parents and sister, although Beylin never gave her their phone numbers but Raza somehow got them;

50. Raza continued to engage in inappropriate, stalking behavior towards Beylin and his friends and business acquaintances, including coming frequently to his apartment unannounced;

51. On one such evening, the situation with Raza became dangerous;

52. Beylin was walking home on or about July 21, 2014 from work;

53. Beylin stopped at a grocery store to purchase food when suddenly, Raza showed up at the store and stood right behind Beylin without saying anything while Beylin was paying at the register;

54. She then surprised Beylin;

55. Beylin explained he could not talk to her then because Beylin had to go home;

56. As Beylin started walking away, Raza grabbed his arm and refused to let go;

57. Beylin kept walking towards his apartment building;

58. Raza forcibly grabbed the middle of Beylin and refused to release him;

59. Raza ripped Beylin's clothes and Beylin called the police, but Raza disappeared before the police arrived;

60. Over the next few weeks Beylin continued to take care of Raza as much as possible by picking her up from the hospital and permitting her to stay at his apartment when she needed to;

### The Events Of August 1, 2014

61. On Thursday July 31, 2014 Beylin got a call from Raza in the morning saying that she needed Beylin to pick her up from the hospital;

62. Raza also stated that she needed him to stay with her during the night as she was not feeling well and was worried about her pregnancy;

63. Beylin picked Raza up at or around 3pm as requested and brought her to Beylin's apartment;

64. Beylin took care of Raza that night;

65. On Friday August 1, 2014 Beylin got up in the morning to go to work;

66. Beylin left at around 6:20 am as he normally did;

67. Raza remained in Beylin's apartment in bed sleeping;

68. Beylin arrived at work around 6:40 am and started his daily routine;

69. At around 9:18am Beylin got a message on his Bloomberg computer terminal from a competitor and acquaintance who worked for Citigroup who informed Beylin that the competitor just received an extremely explicit e-mail from Beylin's personal Gmail account which depicted graphic pictures of a sexual nature;

70. Beylin immediately realized what had just happened;

71. Beylin realized that while Beylin was at work and Raza was left unattended at Beylin's apartment, Raza had hacked into his Apple iPad;

72. Raza had then hacked into a number of files on Beylin's iPad, including hacking into a digital storage account that Beylin maintained and owned at the Apple "iCloud" server that is available online to Apple subscribers;

73. Beylin realized that Raza had discovered extremely personal, highly private photographs that belonged to Beylin and that Beylin no intention whatsoever to share with Raza;

74. Raza then took these digitally stored images in Beylin's "iCloud" account, hacked into Beylin's email account, attached the images and sent them to it is believed each and every email account in his email address account;

75. In so doing, Raza was impersonating Beylin as if it were, in fact, Beylin sending out these images to all of the email addresses from his account;

76. Shortly thereafter, Beylin looked at his cell phone and saw several messages from people replying to the e-mail that Beylin had supposedly sent;

77. Certain persons who responded to the email recognized the email as having been sent by Raza, who previously had engaged in such similar conduct;

78. The replies, however, many of which were from business associates, were generally not in any way understanding;

79. Beylin immediately suffered shock, dismay, anxiety severe distress and fear;

80. Beylin, panicked, immediately left his office and returned home;

81. Beylin opened his iPad an immediately recognized that someone had accessed it that morning while Beylin was in his office and had looked through his browsing history;

82. Beylin, extremely upset, then returned to his office;

83. Throughout the day Beylin got calls and e-mails from clients mentioning the e-mail they received;

76. While home the same day Beylin sent a message to Raza expressing his shock that she would do such a thing;

77. Raza's response was as follows: "Oh…Wow… Well hope all your lies and cheating were worth it.  I would like to continue forward legally.  Please stay away from both me and the kid going forth. Bye";

78. In or around the first week of August 2014, after the email incident, Raza asked Beylin to meet her at a Starbucks near the office;

79. Raza threatened Beylin that her father, a wealthy man, was coming to Boston and she intended to utilize her father and his resources to further make Beylin's life miserable;

80. Beylin construed this as a threat;

81. On or about August 6, 2014, Beylin returned to his office from lunch and was informed by his employer that because one of the firm's best clients had received the graphic email

from Beylin's personal email account, Beylin would be fired if he did not immediately resign;

82. Beylin, given no real choice to keep his job, then resigned a few days shortly thereafter;

83. Upset, Beylin left his now former employer's office;

84. He called Raza to inform her that she had achieved the goal of ruining his career and forcing him to lose his job;

85. Raza responded with satisfaction and further informed Beylin that he could now date anyone he wanted with the newly found time on his hands;

86. To avoid having a black mark on Beylin's FINRA record, he resigned the next day;

87. Beylin then blocked her e-mail and phone number on Beylin's iPhone so he couldn't receive any correspondence from her;

88. Notwithstanding, on or about August 16, 2014, Beylin received another threatening email from Raza;

89. After August 6, 2014, Beylin was contacted by business associates and clients to inform Beylin that they had received e-mails from Raza disparaging Beylin;

90. On information and belief, Raza was fired shortly after the email from her own employer, one of Beylin's clients, because of Raza's participation in the email distribution and wrongful publication of the sensitive photographs;

**THE ONGOING CONDUCT OF HARASSMENT BY RAZA FROM 2015 TO 2017**

91. During the period of approximately 2015 to at least July 2017, Raza continued to engage in a pattern of harassment and abuse towards Beylin;

92. Raza routinely sent disparaging e-mails to business associates;

93. Raza made harassing telephone calls to Beylin's clients;

94. As a consequence, Raza has interfered with Beylin's privacy, his ability to work and to earn a living, and the peaceful enjoyment of his life;

95. Massachusetts General Laws c 214 SECTION 1B provides a private right of recovery for the violation of anyone's right of privacy as follows:

"A person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages";

96. Raza has, by her acts and omissions, intentionally intruded, physically or otherwise, upon the solitude or seclusion of Beylin and his private affairs or concerns;

97. Raza's violation of Beylin's right to privacy subjects Raza to liability to Beylin for the invasion of his privacy, if the intrusion would be highly offensive to a reasonable person;

98. Such invasion of privacy by Raza is in fact highly offensive;

99. Raza has wrongfully, and without the consent of Beylin, accessed Beylin's computer and the private files, data and images contained within to such a degree and without the consent that he is offended, shocked and dismayed by these acts of invasion of Beylin's privacy;

100. Defendant Raza has, by and through the use of Plaintiff's email account, accessed private, highly personal digital images of him from his "iCloud" account, without his permission, consent, or agreement, and in so doing, has impersonated Beylin by appropriating to her own use or benefit the name or likeness of Beylin and emailed these graphic images to addresses from Beylin's private, personal email account;

101. This tortious behavior subjects Raza to liability for any and all damages that Beylin has suffered and continues to suffer as a result of this invasion by Raza of his privacy;

102. The defendant Raza moreover has made use of the Plaintiff's name or likeness for her own wrongful, unlawful purposes and benefit;

103. Defendant Raza has given publicity to a matter concerning the private life of Beylin that is highly offensive to a reasonable person;

104. Defendant Raza has given publicity to a matter concerning the private life of Beylin that is not of legitimate concern to the public;

105. Raza is liable for violations of Beylin's reasonable expectation of privacy;

106. The conduct of Raza against Belin is a knowing, intentional and willful violation of G.L. c. 214 sec. 1b which protects an individual's right to privacy;

107. Raza has knowingly, willfully and intentionally violated such privacy rights of Belin with the intent to cause him harm, and to harm his property rights;

## VIOLATION OF G.L. 272 § 99

108. G.L. c 272 §99 provides in pertinent part:

Any aggrieved person whose oral or wire communications were **intercepted, disclosed or used (emphasis added)** except as permitted or authorized by this section or whose personal or property interests or privacy were violated by means of an interception except as permitted or authorized by this section shall have a civil cause of action against any person who so intercepts, discloses or uses such communications or who so violates his personal, property or privacy interest, and shall be entitled to recover from any such person: 1. actual damages but not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1000, whichever is higher; 2. punitive damages; and 3. a reasonable attorney's fee and other litigation disbursements reasonably incurred.

109. The Defendant accessed Beylin's private wire communications that have been previously sent over the internet to Beylin's Apple Account in the iCloud storage server where Beylin digitally stored the data and images;

110. Raza has accessed Beylin's account without permission to send out emails containing the highly private digital images;

111. Raza wrongfully, unlawfully, and without permission or authority published and otherwise disclosed the same in violation of G.L. c. 272 §99;

112. The actions of Raza were intentional, willful, and for causing harm to Beylin and his property rights and to him;

113. As a consequence, Beylin has suffered and continues to suffer great harm;

114. Beylin is entitled to damages, punitive damages, attorney's fees, costs against Raza;.

## INVASION VIOLATION OF COMMON LAW RIGHT TO PRIVACY

115. Raza has, by her acts and omissions, intentionally intruded, physically or otherwise, upon the solitude or seclusion of Beylin and his private affairs or concerns;

116. Raza's violation of Beylin's right to privacy subjects Raza to liability to Beylin for the invasion of his privacy, if the intrusion would be highly offensive to a reasonable person;

117. Such invasion of privacy by Raza is in fact highly offensive;

118. Raza has wrongfully, and without the consent of Beylin, accessed Beylin's computer and the private files, data and images contained within to such a degree and without the consent that he is offended, shocked and dismayed by these acts of invasion of Beylin's privacy;

119. Defendant Raza, by and through the use of Plaintiff's email account, and accessing and using photographs of him from his "iCloud" account, without his permission, consent, or agreement, and in so doing, thus impersonating Beylin, has appropriated to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy;

120. The defendant Raza moreover has made use of the Plaintiff's name or likeness for her own purposes and benefit;

121. Defendant Raza has given publicity to a matter concerning the private life of Beylin that is highly offensive to a reasonable person;

122. Defendant Raza has given publicity to a matter concerning the private life of Beylin that is not of legitimate concern to the public;

123. The actions of Raza were intentional, willful, and for causing harm to Beylin and his property rights;

124. As a consequence, Beylin has suffered and continues to suffer great harm; Raza is liable for violations of Beylin's reasonable expectation of privacy;

125. The actions of Raza were intentional, willful, and for causing harm to Beylin and his property rights;

126. As a result, Beylin suffers and continues to suffer great damage;

## COUNT I- DETERMINATION OF NON-DISCHARGEABILITY PURSUANT TO 11 U.S.C. §523(a)(6)

127. Plaintiff Beylin realleges the allegations contained in all preceding paragraphs hereinabove and incorporates these allegations by reference if fully restated herein;

128. Defendant Raza has engaged in such a pattern of harassment, interference and acts and omissions that are calculated to cause intentional infliction of emotional distress upon Plaintiff Beylin;

129. The acts and omissions of Raza are extreme and outrageous to such a degree that no reasonable person in society would find such behavior to be normal, tolerable and without the intent to harm;

130. The Defendant's conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized society;

131. The emotional distress suffered by the Plaintiff was severe and of a nature that no reasonable person could be expected to endure it;

132. The acts and omissions of Raza have in fact caused Beylin to suffer extreme and severe emotional harm;

133. The acts, practices and omissions of Raza are calculated, malicious, premeditated and intentional, and have been perpetrated upon Beylin to cause him pain, suffering, severe emotional harm;

134. The acts, practices and omissions of Raza are calculated, willful, premeditated and intentional, and have been perpetrated upon Beylin to cause harm to Beylin's career, reputation, and right to privacy;

135. As a consequence, Beylin has lost his job, has suffered in his career, has engaged in suicidal thoughts and has demonstrated other emotional harm;

136. Beylin has lost friendships, respect, and has suffered harm to his reputation;

137. Beylin has been damaged, and continues to suffer great harm;

138. This conduct constitutes, and rises to the level of willful and malicious injury to both the property and person of the Plaintiff;

139. The First Circuit has ruled that "'willful and malicious' in § 523(a)(6) means an act intentionally committed, without just cause or excuse, in conscious disregard of one's duty and that necessarily produces an injury." Printy v. Dean Witter Reynolds, Inc., 110 F.3d 853, 859 (1st Cir. 1997) (quoting In re Lubanski, 186 B.R. 160, 165 (Bankr. D.Mass. 1995)

140. Malice may be found "even in the absence of personal hatred, spite or ill-will." Id. at 858 (quoting In re Walker, 48 F.3d 1161, 1163 (11th Cir.1995)).

141. The Defendant's actions were intentional, without just cause or excuse, and in conscious disregard of her duty;

142. The Defendant's actions necessarily injured the Plaintiff;

143. This conduct constitutes a non-dischargeable debt pursuant to the provisions of 11 U.S.C. §523(a)(6).

## **PRAYERS FOR RELIEF**

**WHEREFORE,** Plaintiff Beylin seeks the following prayers for relief:

1. A finding for the Plaintiff and a determination that that the conduct of the Defendant Raza was intentional, willful and malicious and has caused injury to both Beylin and the property rights of Beylin;

2. All necessary findings incidental to the findings of intentional, willful and malicious acts and/or omissions, all calculated to cause injury to Beylin and his property and rights, including, if appropriate as determined by this Honorable Court, as to the amount of such non-dischargeable debt;

3. A finding that the malicious and willful injury to the person and property of Beylin is non-dischargeable debt pursuant to 11 USC §523(a)(6);

4. Such debt should be excepted from any discharge of the Debtor pursuant to 11 U.S.C. §727(b);

5. The grant of any other relief that this Court deems just and proper.

Respectfully submitted,
Roman Beylin
by his attorney,

/s/ Jeffrey S. Baker
Jeffrey S. Baker
BBO No. 544929
Baker & Assoc..
Two West Hill Place, Suite 100
Boston, MA 02114
Ph: 617-573-9505
E-mail: bakerlaw@aol.com