

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS

PROBATE & FAMILY COURT
DOCKET NO. 14W2560

ZANUB RAZA,
   Plaintiff,

v.

ROMAN BEYLIN,
   Defendant.

## RATIONALE AND FINDINGS
*(On Complaint to Establish Paternity filed 12/11/14)*

  The primary issue in this Complaint to Establish Paternity filed by the Mother on December 11, 2014 was the issue of child support. The crux of the disagreement pertains to the income that should be used for the Father in the calculation of child support after the loss of his regular full time employment in August 2014. The circumstances surrounding his loss of employment were also contested.

  The parties were in a dating relationship for approximately two years. They never lived together and never shared finances. At the time that they met, they were both employed at Fidelity. Mother was a financial analyst and Father was a sector specialist doing qualitative research earning approximately $75,000. Shortly after they met, the Father left Fidelity to join CLSA, an agent/broker dealer, in a sales role aimed at building relationships to sell their products to people like Fidelity. His contacts at Fidelity, where he had worked for seven years, were important to his success. At CLSA, he had a base salary of $200,000 and a bonus opportunity of $100,000. The Father worked upwards of 60-70 hours per week, starting at 6:00 a.m. It required him to entertain people after work several nights per week.

  The Father described the relationship as volatile, rocky and on and off. The Father characterized the Mother as someone who would try and go through his telephone and email his contacts thinking he was being unfaithful to her. She contacted old girlfriends at certain times and after the breakup posted uncomplimentary comments about the Father on Facebook. They often fought about the Mother's intrusive behavior.

  Mother's pregnancy with Maya was unplanned. Father admitted to having mixed emotions when he found out about the pregnancy because their relationship was so volatile. Mother was upset by his attitude. After they ended their dating relationship, the Father continued to help the Mother out. He testified that "she stayed at my house, she had some surgery, and I got her stuff at CVS, got medication." He testified that he "knows it wasn't easy on her for one reason or another." She never asked him for financial support. There was an

incident in late July 2014 when the Father was walking home from work to a meet friend at an apartment on Tremont Street. He stopped at Avery Provisions and Mother approached him and asked to talk to him. The Father said it was not a good time as he was late and when he turned to go down Tremont Street, the Mother held onto his arm. She grabbed his clothes and insisted that he stop and talk. He threatened to call police. She ripped his pants. When he called police, she let him go. The Father went to his apartment where he was later questioned by the police. He declined to press charges. He saw the Mother get into an uber car near his house and leave.

On the morning of August 1, 2015, Mother was at Father's apartment having stayed overnight. The Father left at 5:30 a.m. and did not take his iPad. At 9:00 a.m. the Father got a Bloomberg message from a friend at a different firm alerting him that something may be wrong with his Gmail account because the friend had just received an email from the Father's Gmail account attaching explicit nude photos of him. Father began receiving numerous messages from friends, clients, and contacts all advising him that they had received an email from him with explicit nude photographs of him attached. When the email first went out, he went home to go through his iPad. The email was not in his sent file. He called the Mother and expressed frustration. She did not deny sending the email. The Father was distraught. As a result of the email incident, Father was given the option by CLSA to resign or have his employment terminated. Father resigned.

At trial, the Mother, who had been left alone in the apartment with Father's iPad, stated that she could not have been the one to send the emails and she offered an email exchange with a colleague at Fidelity around the same time the explicit emails were sent as a defense. Her contention was that the emails to the colleague were proof that she was at work; however, the Mother admitted that she could send work emails from both her laptop and her telephone. The Mother's contention that Father would send such an email to all of his personal and professional contacts and jeopardize his new job for no reason is not tenable. The emails followed the recent altercation and Mother's obvious disappointment with Father's stance on the pregnancy and the long term of the relationship. The Court does not credit Mother's testimony. The Mother underestimates the consequences of this email.

After losing his job, the Father applied for unemployment compensation. The Father collected weekly unemployment benefits of $679.00 from August 3, 2014 to August 8, 2015. (Ex. 36) His lease was up in January 2015 so he cashed in his 401k and received about $16,000 to $20,000 from which he had to pay taxes. He lived on his unemployment and started to apply for new jobs locally and in New York. When the child was born in January 2015, the Father found out from friend who texted him. The Father testified that a mutual stay away order was still in effect and "I think it was" sometime afterward he got paperwork for this case.

The Mother claimed that Fidelity fired her as well because the Father complained about her to Fidelity management. Although she testified that she subpoenaed Fidelity records to show this, she did not offer them. She was able to secure a contract job a few weeks later with NATIXIS Asset Management through a recruiter. She earned approximately $66,560/year until December 2014 working for NATIXIS and she worked there again in March 2015 until September 2015. She was also employed from July 2015 to October 2015 at a company called

2

Shore Light where she earned $32.00/hour. She testified that she worked about 50 hours per week or $1600. In October 26, 2015, she began her current employment as a senior analyst similar to Fidelity but in a different industry. She is in management role and earns $1913.00 per week.

Father began working for Ditto Labs on June 9, 2015 earning $968.00 per week. Father disclosed this information on his Financial Statement dated June 15, 2015. (Exhibit 8). Father provided Mother a copy of his June 2015 pay stub in his Response to Request for Production of Documents. While he was employed at Ditto Labs, Father provided health insurance for the child. A temporary order called for Father to provide insurance at reasonable cost and when employer sponsored. Father worked at Ditto Labs from June 9, 2015 to October 31, 2015. When he lost this job, he lost his health insurance coverage but COBRA coverage was available. The Father failed to notify the Mother that he lost his job and thus she did not know that the child was uninsured. When she found out about the loss of the Ditto job, she claims she tried to enroll the child in Mass Health but they "need more information." Neither party made sufficient effort to make sure this child had health insurance. During the trial, the Mother repeated "I don't talk to him" several times. The fact that the parties could not put aside their differences to make sure that the child had health insurance is troublesome and they are both at fault for this.

In an effort to earn income, the Father connected with a business acquaintance from Fidelity, Ami Joseph. He told Mr. Joseph about his situation. Mr. Joseph was involved with a company called Aptopia helping them sell data to financial companies and asked the Father to join him. In November 2014, the Father and Mr. Joseph formed Hyperscale Research Partners LLC (Ex 26/27) and their purpose was to sell Aptopia data to other entities. Father bought a domain name and built a website, but the business, designed to do marketing did not gain any traction and was not pursued. Hyperscale LLC never had any assets or bank accounts.

In the fall of 2014, Mr. Joseph subscribed to company called InSpectrum, located in Taipei, Taiwan through his company, Joseph Capital Partners (hereinafter "JCP"), which got paid $5000/month less transfer fees as a draw and an advance on future sales. In March 2015, the Father and Mr. Joseph agreed that Father would work as an independent contractor of JCP and they agreed on even split of $2500 per month. Father's weekly income from this draw in March 2015 was $581.00. In April 2015, the payment to the Father increased to $3500 or $831.00 per week. In May 2015, the payment to the Father increased to $3992 or $930.00 per week. Father also obtained a license to sell real estate in December of 2015 but is not actively engaged in selling real estate as he concentrates on his work with JCP. Although InSpectrum terminated the contract with JCP in fall 2015, Mr. Joseph has continued to employ Father as an independent contractor earning $4000/month as they both see growth in the businesses. The Court credits Father's testimony that he engaged in a diligent search for employment and that the email incident has impacted his employment opportunities in the sales and relationship management arena.

The Court credits Mr. Joseph's testimony about the business and the Father's compensation. Mr. Joseph testified that Father's income will be fluid, that there is no written agreement between them relative to compensation, and that he is not withholding any unpaid

3

earnings due to Father. Mr. Joseph testified that his projection for the total gross sales for the market share of Joseph Capital Partners that is managed by Father for 2016 is $80,000.00 in light of past performance, present leads and market volatility, and that 60%, or $48,000.00, of that gross business income will continue to be the gross1099 personal income for the Father. The Court declines to impute an income to the Father above his current gross income as a 1099 employee for JCP. Further, based upon the evidence presented, there is insufficient evidence to reduce this gross income for expenses.

Based on past performance, Father's testimony and the corroborating testimony of Mr. Joseph, the Court finds that Father earns income of $4,000.00 per month. Beginning October 15, 2015, using the Massachusetts Child Support Guidelines, Mother's income of $1,913.00 per week, daycare of $400.00 per week, and health insurance of $114.00 per week, and Father's income of $930 per week, the Father's support order shall be $184.00 per week. The Father has chosen not to seek parenting time or custody at this time. Thus, the Mother will bear the full burden of supporting the child. An upward departure of 30% or ($55.00) due to the lack of parenting time is appropriate and a child support order in the amount of $239.00 shall enter commencing October 15, 2015.

With regard to retroactive adjustment of child support, the Court finds that the parties exchanged four financial statements in Court during this litigation, in February 2015, June 2015, September 2015 and January/February 2016. Mother complains vehemently that the Father did not disclose his income from self-employment accurately or in a timely fashion and she is correct. Mother's financial statements are problematic as well. For example, she lists weekly income of $704 in January 2015 and her testimony established that as soon as March, she was earning $1300/week. In September 2015, she listed her weekly income as $1026 but her testimony established that from July to October she worked at least 50 hours per week earning $32/hr. or $1600 per week. The Court finds that neither party was forthcoming with accurate or timely information regarding changes in their income. While both of their incomes fluctuated for various legitimate reasons, they had ample opportunity to sit down with their counsel and revise the child support to reflect the true numbers along the way before getting to trial.

The Court recalculates and adjusts Father's child support arrears by month, using 4.3 weeks per month to calculate what was paid and what should have been paid to reflect each party's income as follows:

| Month | Unemployment | Ditto | JCP | Father's Inc /Mother's Inc | Weekly Child Support | Adjustment |
|---|---|---|---|---|---|---|
| 3/2015 | 679 | | 581 (2500/mon) | 1260/1300 | 244 | 439 |
| 4/2015 | 679 | | 831 (3500/mon) | 1510/1300 | 289 | 632 |
| 5/2015 | 679 | | 930 (4000/mon) | 1609/1300 | 302 | 688 |
| 6/2015 | 679 | 968 | 930 | 2577/1300 | 441 | 1280 |

4

| 7/2015 | 679 | 968 | 930 | 2577/1600 | 435 | 1266 |
| 8/2015 | x | 968 | 930 | 1898/1600 | 336 | 834 |
| 9/2015 | x | 968 | 930 | 1898/1600 | 336 | 582 (3 wks. @142)* |
| 10/1/2015-10/15/2015 | x | 968 (10/15) | 930 | 1898/1600 | 336 | 237(3 wks@257) |
| 10/1/2015-present | x | x | 930 | 930/1913 | 184 +55=239 | |
| Total Adj due | | | | | | 5958 |

*On 9/25/15, the child support order increased from $142/week to *257/week.

Father shall pay Mother $5958 to adjust his underpayment from March 1, 2016 to October 15, 2016, the effective date of the current order. The Court finds that mathematical precision is impossible given the state of the evidence regarding the exact dates each person's income changed and the amount and date that the Mother began incurring child care costs. Father shall have the option of having the DOR add the $5958 to his arrears or he can choose to pay this off separately. If he chooses to pay if off separately, he shall pay if off in full by December 31, 2016.

Dated: March 21, 2016

Abbe L. Ross, Associate Justice
Suffolk Probate and Family Court