# UNITED STATES BANKRUPTCY COURT

In re: Zanub Raza

Docket No. 17-148-FJB
Chapter 7

)
ROMAN BEYLIN,                         )      Adversary Proceeding No.
)      18-01040-FJB
      Plaintiff                 )
)
v.                                )
)
ZANUB RAZA,                   )
)
      Defendant           )
)

## DEBTOR ZANUB RAZA'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND FOR SANCTIONS

As shown further below, this Court should grant the *Motion for Summary Judgment and for Sanctions* filed by Zanub Raza ("Raza") because of the absence of evidence to support the case of Roman Beylin ("Beylin"), who has the burden of proof, and because of his spoliation.

In this adversary proceeding, Beylin alleges his ex-girlfriend, Raza, sent an email from his account using his iPad to which she attached photographs Beylin took while masturbating to ejaculation. After commencing legal action, Beylin deliberately performed a factory reset on the iPad, erasing from it any evidence that could be used to corroborate his story. Beylin knew the iPad was his *only* possible evidence where the email and photographs are not in his accounts.

## I.      Undisputed Facts.

### A. The parties.

Beylin and Raza started dating in late 2012 or 2013 continuing into the first six months of 2014. Statement of Undisputed Facts ("SUMF"), ¶¶ 1-2. Beylin organized a birthday party for Raza in May 2014 and they conceived a child in the first half of 2014. SUMF ¶¶ 3-4. Beylin and

Raza disagreed about her pregnancy: Beylin wanted her to get an abortion but Raza opted to give birth. SUMF ¶ 5. At some point in June or July 2014, the romantic component to Beylin's and Raza's relationship ended permanently. SUMF ¶ 6. As of July 28, 2014, CLSA Americas, LLC ("CLSA") employed Beylin and he worked at CLSA's office at 99 Summer Street, Boston, while FMR Co, Inc. and FMR LLC (collectively, "Fidelity") employed Raza. SUMF ¶¶ 7-8.

### B. Unbeknownst to Raza, as of July 2014 Beylin was on multiple dating sites and took photographs of himself masturbating to ejaculation to send to other women.

On Monday, July 28, 2014, Beylin went into the single use bathroom CLSA shared with other office suites on its floor where he took photographs of himself masturbating to ejaculation. SUMF ¶ 9. Metadata attached to these photographs shows that Beylin took them between 3:58 PM and 4:31 PM during his CLSA workday. SUMF ¶¶ 10-11. Beylin took these photographs to send them to someone to whom he had been talking and this person was not Raza. SUMF ¶ 12. Beylin and Raza had never sent each other explicit photographs of themselves and Beylin did not tell Raza about these photographs, nor did he show her these photographs, nor did he tell her he was sending them to other people. SUMF ¶¶ 13-14.

Beylin does not remember anything about the woman to whom he sent the explicit photographs of himself other than that he met her on the dating site Tinder, thinks he sent her the photographs the same day that he met her, and she had dark hair. SUMF ¶ 15. Beylin does not remember what information about himself he told the woman to whom he sent the photographs. SUMF ¶ 16. Beylin was on Tinder from 2012 to 2014 and possibly into 2015, and he was on more than a half dozen dating sites between January 1, 2014, and July 31, 2014. SUMF ¶¶ 17-18. Beylin in 2014 met women from various dating sites though he cannot remember how many he met nor how many women he was dating in July 2014. SUMF ¶¶ 19-20.

**C. Raza stayed overnight at Beylin's apartment on July 31, 2014.**

On July 31, 2014, Raza visited Beylin's apartment on the 27th floor of 151 Tremont Street, Boston. SUMF ¶ 21. Raza at the time lived at 1 Park Lane in Boston's Seaport area. *Id*. Raza was pregnant at the time with Beylin's child but they had broken up as of July 31, 2014, and Beylin testified that, "the relationship was not romantic at that point." SUMF ¶ 22. Raza and Beylin had dinner and she stayed overnight at Beylin's apartment. SUMF ¶ 23.

Raza remained in Beylin's apartment when he left for work the next morning on August 1, 2014. SUMF ¶ 24. While in Beylin's apartment, Raza logged into the Fidelity network using her Fidelity-issued laptop so that she could send a work-related email. SUMF ¶ 25. At some point on the morning of August 1, 2014, Raza left Beylin's apartment and at deposition she testified that she might have stopped to get breakfast before she returned to her apartment. SUMF ¶ 26. Raza requested an Uber ride at 9:17 a.m on August 1, 2014, was picked up at 9:22 a.m., and arrived at her destination at 9:36 a.m. SUMF ¶ 27. Trip details from her Uber account further show that she was picked up at 163 Tremont Street in Boston per her 9:17 a.m request and her destination was 1 Park Lane in Boston, where she lived. SUMF ¶ 28. A coffee shop called The Thinking Cup was and still is located at 165 Tremont Street in Boston. SUMF ¶ 29.

**D. On August 1, 2014, people received an email from rbeylin@gmail.com to which were attached the photographs he had taken of himself masturbating to completion; without evidence, Beylin immediately accused Raza of sending it.**

At 9:14 a.m. on Friday, August 1, 2014, various people received an email from rbeylin@gmail.com to which were attached the photographs Beylin had taken of himself (the "Email"). SUMF ¶ 30. The body of the Email was blank and did not identify the person in the photographs and no face or other identifying marks such as a tattoo is visible in the photographs. SUMF ¶ 31. Some recipients were blind copied on the Email. SUMF ¶ 32. Raza herself received

3

the Email and first saw the explicit photographs Beylin had taken of himself when she opened it on August 1, 2014. SUMF ¶ 33. Raza testified that she was "very shocked" because "Beylin and I never had the type of relationship where we would send these types of pictures" and she "never thought of Mr. Beylin to be the type of person to take or send pictures like these." *Id.*

Beylin alleges that Raza used his iPad located in his apartment (the "iPad") to send the Email. SUMF ¶ 34. After learning about the Email, Beylin checked his rbeylin@gmail.com account and could not find the Email in its sent folder nor in its trash folder; he also could not find the explicit photographs he had taken of himself on his iCloud account where he claims he had stored them. SUMF ¶¶ 35-36. Beylin alleges that Raza deleted from his iCloud account the sexually explicit photographs he had taken of himself and from his rbeylin@gmail.com account the Email after she sent it. SUMF ¶ 37. Beylin did not see Raza send the Email nor delete it nor delete from his iCloud account any of the photographs he had taken of himself. SUMF ¶¶ 38-40.

Raza unequivocally denies sending the Email or having any knowledge as to who did. SUMF ¶ 41-42. Raza testified that upon learning about the photographs and first responding to Beylin's text to her accusing her of sending the Email, she felt "very hurt" and "very embarrassed" by his behavior, including feeling embarrassed for her unborn child. SUMF ¶ 43.

As of August 1, 2014, Beylin began telling people that Raza sent the Email. SUMF ¶ 44. As the body of the Email was blank and did not identify the person in the photographs attached to it, and no face or other identifying marks are visible in any of the photographs, it was Beylin who revealed himself to be the person in the photographs attached to the Email. SUMF ¶ 45.

**E. CLSA terminated Beylin because he violated its policy in handling the incident.**

On Monday, August 4, 2014, Beylin sent to his clients, using his CLSA email address, an email that read in part, "Some of you may have received a spam e-mail from my personal Gmail

account on Friday morning (around 9:30 am). My account was hacked and the e-mail was (obviously) not sent by me. Please let me know if you have any questions/concerns (I should have watched the video below about 2-years ago)." SUMF ¶ 50. Below that statement, Beylin included a link to a video called the "Hot Crazy Matrix – A Man's Guide to Women" which, Beylin later described, "shows an exponential line; the hotter the girl, the crazier she is." *Id.*

As of April 16, 2014, Beylin already was on a final written warning from CLSA. SUMF ¶ 51. According to a CLSA-produced document, "Upon a subsequent review of Mr. Beylin's emails, it became clear that Mr. Beylin was aware that several clients (including, but potentially not limited to Fidelity, Eaton Vance, Citigroup, MFS) received the emailed photograph, but in violation of CLSA's policies and procedures and Code of Conduct, Mr. Beylin never notified anyone at CLSA Americas of the incident." SUMF ¶ 52. According to this CLSA-produced document, "Because Mr. Beylin never brought up this issue [that several clients received the Email] to CLSA Americas so that the firm could attempt to do damage control, it was decided that his employment relationship with CLSA Americas needed to be terminated." SUMF ¶ 53.

CLSA terminated Beylin not because of the Email but because of the way he handled it, including by sending an offensive email to clients on August 4, 2014 (presumably, CLSA also was displeased with Beylin's workday activities pleasuring himself in its bathroom).

**F. Starting August 1, 2014, Beylin and Raza engaged in legal action over the Email.**

On August 1, 2014, Beylin went to Boston Municipal Court to seek an abuse prevention order against Raza, testifying by affidavit that she sent the Email using his iPad. SUMF ¶ 46. The Court scheduled a hearing on Beylin's petition on August 11, 2014, and denied it. SUMF ¶ 47. Beylin claims that he also went to the Boston Police on August 1, 2014, concerning the Email though he never filed any police report. SUMF ¶ 48. Beylin never sought any possible

footage taken on the morning of August 1, 2014, from security cameras in his building nor take any other steps to try to find out when Raza left his apartment that morning. SUMF ¶ 49.

On August 13, 2014, Raza sent Beylin an e-mail stating, "I do not want to have to go to court and file something against you, but please do understand this clearly…I will pursue legal action against you if I keep getting approached by people claiming that you are blaming me for things that come out of your email account." SUMF ¶ 54. On August 18, 2014, Raza sought and obtained from the Boston Municipal Court a ten day abuse prevention order against Beylin including an order that he not talk about her to any current or prospective employers and her supporting affidavit explicitly stated that she sought the order because of Beylin's misrepresentations that she sent the Email. SUMF ¶ 55. On August 28, 2014, the Court held a two-party hearing on Raza's petition. SUMF ¶ 56. Attorney Jonathan Plaut ("Plaut") represented Beylin at this hearing and Beylin had provided Plaut a $5,000 check on or around August 14, 2014. *Id.* Fidelity ended Raza's employment effective September 5, 2014. SUMF ¶ 57.

On or about December 11, 2014, Raza initiated a Complaint in Suffolk County Probate Court pursuant to M.G.L. c. 209C to establish Beylin's paternity and support obligations. SUMF ¶ 58. Beylin raised the Email during this case in which he was represented by counsel. *Id.*

On July 28, 2017, Beylin filed suit against Raza concerning the Email in Suffolk County Superior Court, *Beylin v. Raza*, Civil Action No. 1784CV02373 (the "Superior Court Action"), with Jeffrey Baker ("Baker") as his counsel as of that date. SUMF, ¶ 74.

### G. There is no evidence Raza sent the Email.

At deposition, Beylin could provide *no* factual evidence that Raza sent the Email and he could he provide *no* factual evidence to rule out the concept that someone else sent the Email. SUMF ¶¶ 59-60. What Beylin did provide repeatedly was a canned response (actually reading

from the Complaint at one point) that he and Raza had a volatile relationship and she bordered on the unstable. *Id.* Raza denies ever accessing Beylin's phone, iPad, or any other of Beylin's devices without his permission. SUMF ¶ 61. Moreover, Raza testified that Beylin losing his job would have hurt her child support claim and embarrassed her and her child. SUMF ¶ 62.

Despite alleging that Raza was volatile and unstable and accessed his iPhone and iPad without authorization throughout their relationship, Beylin could offer no explanation as to why he left her alone in his apartment on August 1, 2014, and with the iPad. SUMF ¶ 63. Despite claiming that both his iPad and his rbeylin@gmail.com account had been accessed by Raza without authorization on August 1, 2014, Beylin does not recall changing his iPad password nor his rbeylin@gmail.com password on August 1, 2014, or thereafter. SUMF ¶ 64. When asked at deposition, "And you testified that Ms. Raza had exhibited stalking behavior through your relationship?" Beylin testified, "Yes," but after August 1, 2014, he moved into 1 Longfellow Place in the West End Apartments with a new girlfriend, Michelle Janer, who is now his wife. SUMF ¶ 65. Raza lived at 1 Emerson Place in the West End Apartments at the time Beylin moved to 1 Longfellow Place and Beylin and Raza still live at these addresses. *Id.* According to Google Maps, 1 Longfellow Place and 1 Emerson place are .4 miles apart. SUMF ¶ 66.

**H. Beylin, who has no other supporting evidence, intentionally erased the iPad.**

Beylin obtained a minor in information technology in college. SUMF ¶ 67. Beylin admits that, at some point after August 1, 2014, he deliberately reset the iPad that he claims was used to send the Email. SUMF ¶ 68. On May 24, 2018, Beylin's counsel, Baker, certified to the Bankruptcy Court that he counseled Beylin to preserve evidence. SUMF ¶ 69. On June 21, 2018, Raza's counsel conferred with Baker telephonically and expressed a desire to have a forensic analysis performed on the iPad. SUMF ¶ 70. This conversation is memorialized in the Rule 26(f)

discovery plan filed by Baker on June 26, 2018. *Id.* In August 2018, Beylin moved for summary judgment without having yet produced the iPad to Raza for analysis. SUMF ¶ 71. In opposing his motion, Raza raised the possibility that Beylin had committed spoliation of the iPad. *Id.*

Beylin finally made the iPad available for expert analysis on **November 8, 2018**. SUMF ¶ 72. The first time any of Beylin or his counsel revealed to Raza or her counsel that Beylin had previously reset the iPad was when he was deposed on **March 6, 2019**. SUMF, ¶ 73.

On **October 5, 2017,** Raza served her Answer and Counterclaim in the Superior Court Action. SUMF ¶ 75. While there is no indicator as to the exact date(s) Beylin reset the iPad, Raza's expert confirmed a number of timestamps that indicate that a restoration of the iPad took place on **October 8, 2017** and Beylin's expert does not dispute this finding**.** SUMF ¶ 76.

Had the iPad been used to send the Email, it would have retained evidence of such use **if it had not been reset**. SUMF ¶¶ 77, 81. Beylin's resetting of the iPad completely eliminated such evidence and **prevents any ability to analyze whether it was the device used to send the Email**. *Id.* Raza's expert confirmed there is no evidence of the Email in the rbeylin@gmail.com account nor any evidence that the Email was deleted from that account and likewise, there is no evidence that any of the photographs attached to the Email were stored in Beylin's iCloud account nor any evidence that any of them were deleted from that account. SUMF ¶¶ 78-79.

Beylin's putative expert, Peter Kohler ("Kohler") stated in ¶ 76 of his initial report, "Only local data on the [iPad] is affected by a res[e]t" and in ¶ 10 of his rebuttal, "**I agree that resetting the iPad makes any prior data on the local device unrecoverable**." SUMF ¶ 80. This "local data" would show whether the iPad was the specific device used to send the Email but it was deleted from the iPad when Beylin performed a reset on it and it is not recoverable. SUMF, ¶¶ 80-81. Artifacts in this "local data" would have existed showing whether this specific

iPad had been used to send the Email, **even if the Email had been deleted from Beylin's Gmail account after it was sent**. *Id.* Beylin's reset erased any artifacts that could have been analyzed to determine whether the iPad was the specific device used to send the Email. *Id.* It is possible the iPad would have contained additional relevant evidence but there is no way to know because Beylin erased the "local data" on it *Id.*

Kohler concludes, in ¶ 81 of his initial report, "notwithstanding the factory reset of the iPad, no information was lost. Mr. Beylin took reasonable steps to preserve the information because it was synched with hits [*sic*] iCloud account that backups the data." SUMF ¶ 82. This Paragraph contradicts Kohler's initial report, ¶ 76, and rebuttal report, ¶ 10, quoted above. *Id.*

In reality, before or at the time he wrote ¶ 81 of his initial report Kohler did not have access to the iPad nor did he perform any analysis on it. SUMF ¶ 83. Beylin has not produced *any* information recovered from the iPad, SUMF ¶ 84, nor *any* information from his "iCloud account that backups the data" as referenced by Kohler in ¶ 81 of his report. SUMF ¶ 85. Beylin produced no forensic mirror image of the iPad made and preserved before he reset the device. *Id.* Nowhere does Kohler even attempt to show that iPad was used to send the Email. SUMF ¶ 86. Kohler goes so far as to claim in his rebuttal report, ¶ 3, that he relied on material from Beylin's Gmail and iCloud accounts for his initial report but he later concedes in his rebuttal report that the Email and images are absent from them, ¶ 15. SUMF ¶ 83. **In reality, Kohler did not even access any of the iPad, Gmail, and iCloud accounts as part of his "analysis"**. *Id.* The entirety of Kohler's "analysis" is to say that he agrees with some Fidelity-produced documents.

Fidelity never had access to the iPad and performed no analysis on it. SUMF ¶ 87. Fidelity-produced documents show Raza connected to the Fidelity network on August 1, 2014, using her Fidelity-issued laptop from 7:57:49 a.m. to 9:32:39 a.m. from IP address 24.218.7.146.

SUMF ¶ 88. Metadata for the Email also includes the IP address 24.218.7.146. SUMF ¶ 89.

Because this same IP address appeared on Raza's login credentials as well as on the Email,

Fidelity concluded she must have been responsible for sending it. SUMF ¶ 90. Fidelity

terminated Raza. SUMF ¶ 57.[1] **As shown below, this fact is inconclusive.** SUMF, ¶ 96.

Kohler then concludes that Raza sent the Email because, to quote ¶80 of his initial report:

- It is likely Ms. Raza knew the password/PIN code to Mr. Beylin's iPad and no additional information was required to unlock the device.
- On the morning of August 1, 2013 Ms. Raza was alone at Mr. Beylin's apartment with access to the iPad.
- The Explicit Images and Mr. Beylin's email account were both accessible through the iPad.
- The Fidelity ERA Logs clearly show Ms. Raza connected to the Fidelity network from IP address 24.218.7.146 on August 1, 2014, from 7:57 am to 09:32 am.
- The email header from the Explicit Email show it originated from IP address 24.218.7.146 on August 1, 2014 at 9:14 am.

SUMF ¶ 91. The first and third bullet points are major – and undocumented – assumptions and

reliance on 24.218.7.146 is **inconclusive**. SUMF, ¶ 96.

Nowhere does Beylin proffer any evidence to identify what 24.218.7.146 signifies.

SUMF ¶ 92. 24.218.7.146 was a global, not device-specific, IP address, as confirmed because it

appears on Raza's Fidelity account login via her laptop as well as the Email which seems to have

been sent from *an* iPad. SUMF ¶ 93. As a global IP address, 24.218.7.146 could apply to an

unknown number of different devices connected to a network of unknown size covering a

_____

[1] Beylin inappropriately disclosed Fidelity as an "expert witness," though neither Fidelity nor the individuals named know he has done so. In his "disclosure," Beylin identifies three Fidelity individuals – Scott Olson, Wayne Pronzati, and Julie Burns – as his "experts" but because he does not know whether they even still work at Fidelity he includes a catchall provision that he otherwise expects Fidelity will produce someone else for him. Beylin's "disclosure," which includes materials completely outside the scope of this adversary proceeding, is not signed by any of these putative "experts" but by Beylin's lawyers. Separately, on May 24, 2019, Beylin supplemented his Rule 26(a)(1) disclosure to name these same three individuals as fact witnesses. Fact discovery closed March 19, 2019, and Beylin knew the identity of these witnesses at least as of August 2018 because their names appear in his summary judgment filing. Pursuant to Fed. R. Civ. P. 26(e)(1)(A), made applicable to this adversary proceeding pursuant to Fed. R. Bankr. P. 7026, supplementation of Rule 26A disclosures are to be made "in a timely manner[.]" Disclosing fact witnesses two months *after* the close of fact discovery is not supplementation "in a timely manner[.]"

geographic area of indeterminate magnitude. SUMF ¶ 94. All that is known about this IP address is that it signifies a global IP address relevant to an unspecified area that happened to include Beylin's apartment. *Id*. **Both experts agree there is no evidence as to the number of users, how many different people have the ability to log into this network at any time, the number of devices used by these users, or even the geographic area covered by this global IP address.** SUMF ¶ 95. Absent evidence from the iPad, Kohler relies solely on the existence of a global IP address (24.218.7.146) on Raza's Fidelity login materials as well as the metadata of the Email to conclude that Raza sent the Email. SUMF, ¶ 96. The existence of this global IP address on Raza's Fidelity account activity and the Email's metadata is **inconclusive**. *Id*. Had Beylin not reset the iPad, an examination of it would have been **conclusive** at least as to establishing whether it was the specific device used to send the Email. SUMF ¶ 97.

On May 25, 2019, Raza's counsel sent an email to Beylin's counsel calling attention to Beylin's spoliation of the iPad, lack of evidence, and inability to meet his burden of proof and put Beylin's counsel on notice that Raza would seek sanctions for spoliation as well as the frivolous, improper, and bad faith nature of Beylin's claims. SUMF ¶ 98.

## II. Legal Argument

### A. Standard for Raza's Motion for Summary Judgment

"A court 'shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' A genuine issue is 'one that is supported by such evidence that 'a reasonable jury, drawing favorable inferences,' could resolve [the issue] in favor of the nonmoving party.' A material fact is one that might affect the outcome of the case under the governing law." *In re Marano*, 568 B.R. 723, 726 (Bkrcy. Mass. June 14, 2017) (citations omitted).

"[S]ummary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Ellis v. Fid. Mgmt. Trust Co.*, 883 F.3d 1, 7 (1st Cir. 2018) (affirming district court's grant of summary judgment) (citation omitted); *see also Gonzalez-Pina v. Guillermo Rodriguez*, 407 F.3d 425, 431 (1st Cir. 2005) ("The nonmoving party 'must present definite, competent evidence to rebut the motion,' *Mesnick* v. *Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991); otherwise, 'summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation,' *Rivera-Cotto* v. *Rivera*, 38 F.3d 611, 613 (1st Cir. 1994) (internal quotation omitted). 'The mere existence of a scintilla of evidence' in the nonmoving party's favor is insufficient to defeat summary judgment.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).").

"If the moving party does not have the trial burden of production, it may satisfy its initial summary judgment burden by showing 'that there is an absence of evidence to support the nonmoving party's case.'" *Mass. Inst. of Tech. v. Harman Int'l Indus.*, 584 F. Supp. 2d 297, 308 (D. Mass. Sept. 9, 2008) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "The Court must grant summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial.'" *Id*, 584 F. Supp. 2d at 308 (quoting *Celotex*, 477 U.S. at 322).

### B. Raza is entitled to summary judgment because Beylin has no evidence to support allegations on which he has the burden of proof.

Beylin has the burden of proof in this adversary proceeding. "Exceptions to discharge are narrowly construed in favor of the debtor. The burden of proof is on the creditor to prove all applicable elements of the exception to discharge and to do so by a preponderance of the

evidence." *In re Shannon*, 2014 Bankr. LEXIS 4631, *16 (Bkrcy. Mass. Nov. 4, 2014) (Bailey, J.), citing *McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001). "Section 523(a)(6) excepts from discharge any debt for 'willful and malicious injury by the debtor to another entity or to the property of another entity.' 11 U.S.C. § 523(a)(6). It requires injury to another 'entity,' which is a defined term that includes a person, 11 U.S.C. § 101(15), or to 'the property of another entity.' The injury must be both willful and malicious. 'Willfulness' requires a showing of intent to injure or at least of intent to do an act which the debtor is substantially certain will lead to the injury in question. 'Malicious' requires the injury to have been 'wrongful,' 'without just cause or excuse,' and 'committed in conscious disregard of one's duties.' Malice thus has both objective and subjective elements: the injury must have been objectively wrongful or lacking in just cause or excuse; and the debtor must have inflicted the injury in 'conscious disregard' of duty, meaning with awareness that the act was wrongful or lacking in just cause or excuse. 'An injury is malicious if it was wrongful and without just cause or excuse, even in the absence of hatred, spite or ill-will.'" *Levitsky v. McPherson (In re McPherson)*, 564 B.R. 6, *19 (Bkrcy. Mass Jan. 17, 2017) (Bailey, J.) (granting discharge) (citations omitted).

As a threshold matter, Beylin cannot show that Raza even committed the act of which he accuses her, eliminating the Court's need to analyze intent. As to the element of intent, the record evidence shows Raza had every *dis*incentive to disseminate the photographs had she even known about them: the Email incident embarrassed her and her unborn child and anything affecting Beylin's employment worked to her child's detriment. SUMF ¶¶ 33, 43, and 62.

Instead, as shown in Section I above, Beylin's entire case rests on conclusory allegations, improbable inferences, and unsupported speculation. The *only* fact Beylin proffers is an **inconclusive** one: that an IP address that appears on Raza's Fidelity login records on the

morning of August 1, 2014, 24.218.7.146, also appears in the Email's metadata. SUMF ¶ 96.

**Beylin has nothing else**. Beylin has *no* evidence to identify what 24.218.7.146 signifies when in fact, as a global, not device-specific, IP address, 24.218.7.146 could apply to an unknown number of different devices connected to a network of unknown size covering a geographic area of indeterminate magnitude. SUMF ¶¶ 92-95. All that is known is that 24.218.7.146 signifies a global IP address relevant to an unspecified area that happened to include Beylin's apartment. *Id.* **Both experts agree** there is no evidence as to the number of users, how many different people have the ability to log into this network at any time, the number of devices used by these users, or even the geographic area covered by this global IP address, 24.218.7.146. SUMF ¶ 95. Moreover, Fidelity documents show Raza connected to its network from this global IP address from 7:57:49 a.m. to 9:32:39 a.m. on August 1, 2014, SUMF ¶ 88, while Uber materials show that for at least ten minutes of this time she was being driven to the Seaport after hailing her ride from a coffee shop at 9:17 a.m. (the Email was sent at 9:14 a.m.). SUMF, ¶¶ 27-28.

A close examination of the lengthy initial report Kohler signed at Samito Aff., Ex. 15, shows that almost all of it is non-relevant background and broad assumptions: pp. 1-3 cover Kohler's credentials; pp. 4-11 inappropriately (in a purported expert report) rehash Beylin's accusations about Raza's snooping and "bizarre behavior" during their relationship; pp. 12-18 offer generic information about emails; and pp. 18-21 provide a summary of some Fidelity-produced documents. Finally, on pp. 21-24, Kohler gives the thin gruel that is his "analysis" and it is a single fact: 24.218.7.146 appears on Raza's Fidelity login information and it also appears in the Email's metadata. The rest of Kohler's "analysis" rests on assumptions such as, "Ms. Raza had access to the iPad," ¶ 77, and "It is likely that Ms. Raza knew the password/PIN code to Mr. Beylin's iPad," ¶ 80. In essence, because 24.218.7.146 appeared on the Fidelity login credentials

and Email metadata, and Beylin told him Raza sent the Email, Kohler concludes that Raza did it. Kohler's rebuttal report, at Samito Aff., Ex. 15A maintains this same level of analytic quality.

A close examination of the Fidelity documents shows the same level of analysis – because 24.218.7.146 shows up in two places, Raza did it. SUMF ¶ 90. At least Fidelity confirmed that the Email was *not* sent from Raza's Fidelity-owned laptop. *Id.*

There is nothing else to analyze. Beylin testified and Raza's expert confirmed that the Email is not located in his rbeylin@gmail.com account nor are the photographs located in the iCloud account where he stored them. SUMF ¶¶ 35-36, 78-79. Beylin admits he reset the iPad he claims was used to send the Email, precluding its analysis for artifacts to confirm or disprove his allegation and eliminating all other possible evidence. SUMF ¶¶ 68, 77, 81.

Beylin cannot dispute that he committed this act of spoliation on *the* key piece of evidence *after* commencing legal action against Raza. On **August 1, 2014**, Beylin sought (but did not obtain) an abuse prevention order against Raza and he testified in his supporting affidavit that Raza sent the Email using his iPad, identifying it as a key piece of evidence. SUMF ¶¶ 46-47. Beylin claims he spoke with the Boston Police about the Email that same day. SUMF ¶ 48.

Moreover, on August 13, 2014, Raza put Beylin on notice that she would pursue litigation against him, stating, "I will pursue legal action against you if I keep getting approached by people claiming that you are blaming me for things that come out of your email account." SUMF ¶ 54. The very next day, August 14, 2014, Beylin paid an attorney to assist him concerning legal issues involving Raza. SUMF ¶ 56.  This attorney attended a hearing on August 28, 2014, involving Raza's petition for an abuse prevention order against Beylin because he continued telling people she sent the Email. SUMF ¶¶ 55-56. Beylin also raised the Email during

proceedings Raza initiated in December 2014 to establish his paternity and support obligations and at which he was represented by counsel. SUMF ¶ 58.

Finally, Beylin commenced the Superior Court Action against Raza concerning the Email on July 28, 2017, in which he again was represented by counsel. SUMF ¶ 74.

**Beylin admits he deliberately reset the iPad after August 1, 2014, despite knowing its importance as evidence (the absence of the Email and photographs from his accounts meant the iPad was his *only* possible evidence which made its preservation all the more critical), despite a history of legal action on this issue that Beylin started *hours* after the Email was sent, and despite his continual representation by various attorneys,.** SUMF ¶ 68. While the date he reset the iPad is unknown, Raza's expert could identify **October 8, 2017**, as the date on which Beylin performed a restoration of it. SUMF ¶ 76. Raza served her answer and counter-claims in the Superior Court Action on **October 5, 2017**. SUMF ¶ 75. It is reasonable and appropriate to infer that Beylin reset the iPad on or around **October 8, 2017 (as his expert believes,** *see* Kohler rebuttal report, ¶ 9, at Samito Aff., Ex. 15A). Nonetheless, even if Beylin reset the iPad earlier he has committed spoliation, as he commenced legal action against Raza on August 1, 2014. In any event, Beylin unequivocally adulterated *the* key piece of evidence in this case within days of receiving Raza's answer and counterclaims. Beylin willfully and with intent destroyed the electronic information on the iPad during a litigation he initiated.

With the IP address being inconclusive, no evidence concerning the Email in his Gmail account, no evidence concerning the explicit photographs in his iCloud account, and Beylin's deliberate act of resetting the iPad, all that remains of Beylin's case is his litany of slurs about Raza. *See* Complaint at Dkt. 1; Kohler report, pp.4-11. In opposing this motion, Raza anticipates Beylin will raise these same tired accusations against her. Beylin will undoubtedly claim that

Raza looked at his iPhone on a trip they took together to Foxwoods in 2013 and had a history of unauthorized access to his electronic devices, and that she was volatile, and that she stalked him, etc. Even if these things were true – and the evidence shows otherwise where Beylin remained in a relationship with Raza until mid-2014, planned her birthday party, impregnated her, left her alone in his apartment, and after their breakup moved to within blocks of where she lives and remains there today, SUMF ¶¶ 2-4, 63, 65-66 – none of it is relevant to whether Raza sent the Email. Beylin has the burden of proof to show not that their relationship had ups and downs but that Raza sent the Email with willful and malicious intent. He cannot meet this burden.

### C. The Court should award sanctions related to Beylin's spoliation.

Under Fed. R. Civ. P. 37(e), "[a] duty to preserve evidence arises 'the moment that litigation is reasonably anticipated.'" *Brewer v. Leprino Foods Co.*, 2019 U.S. Dist. LEXIS 14194, *25 (E.D. Cal. January 29, 2019) (citation omitted). Here, that moment occurred August 1, 2014, when Beylin filed a petition for abuse prevention and went to the Boston Police, and it continued throughout his persistent legal sparring and litigation with Raza.

Upon this record, it cannot be disputed that Beylin intentionally reset the iPad at a time when the electronically stored information on the iPad "should have been preserved in the anticipation or conduct of litigation"; that this information "[was] lost because [Beylin] failed to take reasonable steps to preserve it"; and, that this information "cannot be restored or replaced through additional discovery[.]" Fed. R. Civ. P. 37(e).

It also cannot be disputed that Raza suffered prejudice where she cannot analyze *the* key piece of evidence – in fact, the *only* piece of evidence – to prove or disprove Beylin's claim that the iPad was used to send the Email. SUMF, ¶¶ 77, 81. Beylin has made not even a minimal attempt to mitigate this prejudice – he has produced *nothing* in an attempt to do so because he

truly has nothing to produce. SUMF ¶¶ 84-85. Accordingly, sanctions are warranted which the Court has great discretion in crafting regardless of the intent of the non-moving party: "upon finding prejudice to another party from loss of the information, [the Court] may order measures no greater than necessary to cure the prejudice[.]" Fed. R. Civ. P. 37(e)(1).

Additionally, Fed. R. Civ. P. 37(e)(2)(A) and (C), allows the Court, "upon finding that the party acted with the intent to deprive another party of the information's use in the litigation," to "presume that the lost information was unfavorable to the party" or "dismiss the action or enter a default judgment."[2] The Court may infer intent in determining sanctions pursuant to Fed. R. Civ. P. 37(e)(2). *Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 431 (W.D.N.Y. Sept. 21, 2017) (citing *Ala. Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 2017 WL 930597 (N.D. Ala. March 9, 2017), where the court held that a party may be found to have acted with an intent to deprive within the meaning of Rule 37(e)(2) where, as here, "(1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.").

In *Moody*, the Court inferred intent where, similar to what Beylin did, a party allowed original data on an event recorder to be overwritten while knowing of a duty to preserve such highly relevant evidence. *Moody*, 271 F. Supp. 3d at 431-32. In another Rule 37(e)(2) case, the Court ordered monetary sanctions and that it would craft an appropriate jury instruction after a party, "in an effort to sidestep a finding of intent . . . claim[ed] that she innocently lost the text

---

[2] Fed. R. Civ. P. 37(e)(2)(B) concerns jury instructions inapplicable to this matter.

messages in October 2014 when she placed her phone on the hood of her car and drove away."
*Brewer*, 2019 U.S. Dist. LEXIS 14194 at *31-32. The *Brewer* Court further noted that, "[a]t first

blush, [the Spoliating Party's] explanation seems plausible, but the overwhelming objective

evidence, and her lack of corroboration, suggests otherwise." *Id.* Beylin can offer no plausible

excuse as to resetting the iPad, especially where the evidence indicates that he did so within *days*

of service of Raza's answer and counterclaim in the Superior Court Action.

And, in a case squarely in line with what Beylin did here, a District Court found in

awarding Rule 37(e)(2) sanctions that, "a factory reset of the iPads and the wiping of the hard

drive were performed after [Spoliating Party] knew how important the evidence on those

Devices was to Plaintiff and his lawsuit. This action could not have occurred without intent," and

"the timing of the destruction of the data on the Devices . . . evinces bad faith."*Folino v. Hines*,

2018 U.S. Dist. LEXIS 193564, *8-9 (W.D. Pa. November 14, 2018). In that case, the Court

granted default judgment and the costs and fees incurred to file the spoliation motion and for the

"futile forensic examination of [Spoliating Party's] Devices as sanctions." *Id.* at *13.

Exacerbating his spoliation, Beylin and his counsel remained silent about it and forced Raza, in

bankruptcy, to hire an expert to analyze an iPad they knew had been erased. SUMF ¶¶ 68-73.

If there is a question whether Rule 37(e) applies to the extent Beylin was not a party to

this adversary proceeding at the time of his spoliation, his conduct concerning electronically

stored information remains subject to sanction through this Court's inherent and concurrent

power under 11 U.S.C. §105. *In re Correra*, 589 B.R. 76, 123-124 (Bankr. N.D. Tex. August 21,

2018) (awarding monetary sanctions against a non-party for spoliation as well as monetary

sanctions against the party along with an order to show cause why further sanctions should not

be entered against that party pursuant to Rule 37(e)). The Court "has an 'inherent power to

control the judicial process and litigation, a power that is necessary to redress conduct 'which abuses the judicial process.'" *Schlossberg v. Abell (In re Abell)*, 2016 Bankr. LEXIS 1690, *51 (Bankr. D. Md. April 14, 2016) (also finding that pursuant to 11 U.S.C. §105, Bankruptcy Court has authority to take any action or make any determination necessary or appropriate "to prevent an abuse of process."). In dealing with a case of spoliation of electronically stored information, the *Schlossberg* Court entered judgment and awarded attorney's fees and costs including but not limited to investigatory costs into the spoliator's conduct. *Id*. at * 81-82.

This Court should enter judgment in Raza's favor and order Beylin to pay her costs of this adversary proceeding, including but not limited to attorney's fees, as sanction for his spoliation. Beylin caused Raza to endure this lengthy litigation *knowing* he has no evidence to support his claim and *knowing* that he erased the iPad to prevent its analysis for evidence. Beylin and his attorneys have acted with absolute disregard for the resources of Raza and this Court. Beylin and his attorneys have caused Raza to pay for deposition transcripts in a case with no evidence and allowed her to hire an expert to analyze an iPad they *knew* to have been erased. If there is any doubt about their motive, Raza reminds the Court that Beylin and his attorneys remained silent while a debtor incurred costs for a forensic examination they *knew* would be futile. Raza's attorneys have performed extensive work on this matter – a matter that never should have been brought. This entire case has been an exercise by Beylin and his counsel in abuse of process and the Court should not tolerate it. Beylin brought this suit not as a good faith litigant but as a vengeful ex-boyfriend, a gross misuse of the resources of the judiciary.

### III. Conclusion.

Raza respectfully requests that this Court grant her *Motion for Summary Judgment and for Sanctions*, enter judgment in her favor in this matter, and award her all costs and fees.

Respectfully submitted,

ZANUB RAZA.

By her attorneys,

*/s/Christian G. Samito*
Christian G. Samito,
Samito Law, LLC
15 Broad Street, Suite 800
Boston, MA 02109
(617) 523-0144 (telephone)
BBO# 639825
Christian@samitolaw.com

*/s/ Edward J. Neville, III*
Edward J. Neville, III
15 Broad Street, Suite 800
Boston, Massachusetts 02109
Telephone: 617-742-1166
BBO# 369810
Ejn3esq@gmail.com

Dated: June 25, 2019

**CERTIFICATE OF SERVICE**

I, Christian G. Samito, attorney for the Debtor and Adversary Proceeding Defendant,

Zanub Raza, hereby certify that a true copy of the foregoing was served on June 25, 2019, on the

following:

Via the ECF System:

      Jeffrey S. Baker, Attorney for Adversary Proceeding Plaintiff

      Patrick Groulx, Attorney for Adversary Proceeding Plaintiff

      Joseph G. Butler, Chapter 7 Trustee

      James Lynch, U.S. Trustee

I served the foregoing documents via first class mail, postage prepaid, to:

      Zanub Raza (Debtor/Adversary Proceeding Defendant)
      One Emerson Place, # 9 - O
      Boston, MA  02114

                        Respectfully submitted,
                        Zanub Raza, Debtor/Adversary Proceeding
                        Defendant,
                        By her attorney,

                        */s/* Christian G. Samito
                        Christian G. Samito
                        Samito Law, LLC
                        15 Broad Street
                        Suite 800
                        Boston, MA 02109
                        617-523-0144
                        BBO# 639825
                        christian@samitolaw.com

Dated: June 25, 2019