| | |
|---|---|
| ZANUB RAZA,<br><br>Debtor | Docket No. 1:17-bk-14818 |
| ROMAN BEYLIN,<br><br>Plaintiff,<br><br>v.<br><br>ZANUB RAZA,<br><br>Defendant | Docket No. 1:18-ap-01040<br><br>Chapter 7 |

## RESONSES TO THE DEFENDANT'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT AND SUPPLEMENTAL STATEMENTS OF FACT

NOW COME the Plaintiff and submits the following responses to the statement of material facts in support of the Defendant's Motion for Summary Judgment.

1. Beylin and Raza started dating in late 2012 or 2013. See Deposition of Roman Beylin ("Beylin Depo."), 28.13 ("We started dating around late 2012, 2013[.]")

   **Plaintiff's Response:** Admitted.

2. Beylin and Raza continued dating in the first six months of 2014. See Beylin Depo., 37.6-9 (Q: You continued dating Ms. Raza in the first six months of 2014; is that fair to say? Mr. Baker: Objection. A: Off and on.")

   **Plaintiff's Response:** Admitted.

3. Beylin organized a birthday party for Raza in May 2014. See Beylin Depo., 116.9-12 ("Q: All right. And in fact, you set up that birthday party for Ms. Raza at Storyville, correct? A: I think so, yes.")

**Plaintiff's Response:** Admitted.

4. Beylin and Raza conceived a child in 2014 and in light of her birth date in January 2015, this conception took place in the first half of 2014. See Beylin Depo., 74.2-4 (Q: Do you have any understanding of when you and Ms. Raza conceived? A: Some point in 2014")

**Plaintiff's Response:** Admitted.

5. Beylin and Raza disagreed about her pregnancy: Beylin wanted her to get an abortion though Raza opted instead to give birth. See Beylin Depo., 74.22-75.1 (Q: Did you ever urge Ms. Raza to get an abortion? A: I wouldn't use "urge", but I -- I had wanted Ms. Raza to get an abortion[.]")

**Plaintiff's Response:** Admitted.

6. At some point in June or July 2014, the romantic component to Beylin's and Raza's relationship ended permanently. See Beylin Depo., 37.6-9 (Q: You continued dating Ms. Raza in the first six months of 2014; is that fair to say? Mr. Baker: Objection. A: Off and on.); 128.9-12 (Q: And had you and Ms. Raza broken up as of July 31st 2014? A: Yes, the relationship was not romantic at that point.)

**Plaintiff's Response:** Admitted.

7. As of Monday, July 28, 2014, CLSA Americas, LLC ("CLSA") employed Beylin and he worked at CLSA's office at 99 Summer Street, Boston. See Beylin Depo., 7.12-17 (Q: Was 99 Summer Street where you worked at the time? A: That's correct. Q: Who employed you at the time that you took the photographs? A: A company called CLSA.)

**Plaintiff's Response:** Admitted.

8. As of Monday, July 28, 2014, Raza was employed by FMR Co, Inc. and FMR LLC (collectively, "Fidelity"). See Affidavit of Zanub Raza ("Raza Aff."), ¶ 1.

**Plaintiff's Response:** Admitted.

9. On Monday, July 28, 2014, Beylin went into the single use bathroom CLSA shared with other office suites on its floor at 99 Summer Street, Boston, where he took a series of photographs of himself masturbating to ejaculation. See photographs already filed under seal with the Court, see Dkt. No. 15-3, pp. 4-6 and Dkt. 23, and not provided again here; Beylin

Depo., 7.1-8.5 (Q. And each of the photographs attached to the August 1st e-mail is a photograph of you, correct? A. Correct. Q. Who took each of the photos attached to the August 1st e-mail? A. I did. Q. Where did you take each of these photos? A. In a bathroom. Q. Where was the bathroom? A. At -- I believe it was 99 Summer Street. Q. Was 99 Summer Street where you worked at the time? A. That's correct. Q. Who employed you at the time that you took the photographs? A. A company called CLSA. Q. And did you take the photographs in the bathroom of your CLSA office? A. It was a lobby, a lobby bathroom. Q. It was a lobby bathroom? A. In the building. Q. In the building? A. Correct. So multiple people could use the bathroom at the same time? A. No, it was a private bathroom. Q. So just one person at a time? A. Correct.); 10.20-11.8 (Q. Why didn't you go to the bathroom in your office? A. There is no bathroom in the office. It was a shared bathroom in the lobby. Q. Is this a lobby in the bottom floor of 99 Summer or is this a shared, a bunch of suites where there's one bathroom in the middle of a floor? A. Um, it was not shared suites, but it was very -- I believe on the floor there were two to three companies with their own office space. And there was a bathroom in the same area where you had the elevator (indicating).)

**Plaintiff's Response:** Admitted.

10. Metadata attached to the explicit photographs shows that Beylin took them between 3:58 PM and 4:31 PM. See Affidavit of Christian G. Samito ("Samito Aff."), Ex. 1.

    **Plaintiff's Response:** Admitted.

11. Beylin took these photographs of himself masturbating to ejaculation during his CLSA workday. See Beylin Depo., 10.6-7 ("But typically, a workday would be done around -- between 4:30 and 5:30."); 10.15-19 (Q: An employer would have assumed you would have been working during this time? A: I'm allowed to take bathroom breaks. (Laughter.) It was during a workday.)

    **Plaintiff's Response:** Admitted.

12. Beylin took the photographs of himself masturbating to ejaculation to send them to someone to whom he had been talking and this person was not Raza. See Beylin Depo., 12.2-4 (Q: Why were you taking these photographs? A: Um, to send them to someone that I had been talking to.)

    **Plaintiff's Response:** Admitted.

13. Beylin and Raza had never sent each other explicit photographs of themselves. See Beylin Depo., 17.11-15 (Q: You didn't have that kind of relationship with Ms. Raza where you were exchanging explicit photographs with each other, correct? A: Um, I don't believe we've sent explicit photographs to each other.)

**Plaintiff's Response:** Admitted.

14. Beylin did not tell Raza about the photographs he took of himself masturbating to ejaculation on July 28, 2014, nor did he show her these photographs, nor did he tell her that he was sending explicit photographs of himself to other people. See Beylin Depo., 19.4-11 (Q. Did you tell her about the photographs? A. I did not. Q. Did you show her the photographs? A. I did not. Q. Did you tell her that you were sending explicit photographs of yourself to people on Tinder? A. I did not.)

**Plaintiff's Response:** Admitted.

15. Beylin does not remember anything about the woman to whom he sent the explicit photographs of himself other than that he met her on the dating site Tinder, thinks he sent the photographs on the same day that he met her, and she had dark hair. See Beylin Depo., 20.7-21.6 (Q. And you can't remember the person to whom you sent the photographs of yourself? A. I can't remember the name of the person, correct. Q. Tell me what you do remember about her. A. I -- I remember she sent me some photographs. I remember -- I believe she had dark hair. Q. How old was she? A. I do not recall an exact age. Q. Do you recall what career she put down? A. I do not recall. Q. So you don't remember anything about this woman; yet you sent her explicit photos of yourself masturbating; is that your testimony? Mr. Baker: Objection. A. Um, we had chatted on Tinder. Q. For how long had you chatted on Tinder before you sent the photographs to her? A. I don't recall exactly for how long. Q. Did you meet her just that same day or had you been talking to her prior? A. To the best of my recollection, I believe it was the same day.)

**Plaintiff's Response:** Admitted.

16. Beylin does not remember what information about himself he told the woman to whom he sent the explicit photographs he had taken of himself. See Beylin Depo., 69.8-12 (Q: Do you recall anything whatsoever that you told [or] said to this woman to whom you sent photos of yourself masturbating? A: I don't recall the details of the conversation.)

**Plaintiff's Response:** Admitted.

17. Beylin was on the dating site Tinder from 2012 to 2014 and possibly into 2015. See Beylin Depo., 68.18-21 (Q: In the course of your life, how long a span of time have you been on Tinder? A: I was – as far as I can recall I was on it 2012 to 2014,'15 maybe.)

    **Plaintiff's Response:** Admitted.

18. Beylin was on more than a half dozen dating sites between January 1, 2014, and July 31, 2014. See Beylin Depo., 96.5-14 (Q: So prior to July 31st 2014, identify for me all of the dating sites that you were on at any point in time from January 1st 2014 on to July 31st 2014. A: It's hard for me to remember all of them but I would say Coffee Meets Bagel, OkayCupid, Tinder, Bumble, The League, maybe JDate, and I'm probably missing one or two. Q: Match? A: Oh, Match.)

    **Plaintiff's Response:** Denied. The quoted testimony only states six sites of which Mr. Beylin is sure.

19. Beylin in 2014 met women from various dating sites though he cannot remember how many he met. See Beylin Depo., 97.12-16 (A: Um, in 2014 I did meet in-person [sic] some women that I met on these web sites, yes. Q: How many women did you meet in 2014 from these web sites? A: I don't recall an exact number.)

    **Plaintiff's Response:** Admitted.

20. Beylin cannot recall how many woman he was dating in July 2014. See Beylin Depo., 94.14-24 (Q: How many women were you dating in July of 2014? A: I don't recall. Q: Was it that many that you can't recall how many there were? A: No, it was that I can't recall if it's zero, one, two, three, four. I don't recall. Q: It might have been as many as four women other than Ms. Raza that you were dating in July of 2014? A: I don't recall.)

    **Plaintiff's Response:** Admitted.

21. On July 31, 2014, Raza visited Beylin's apartment on the 27th floor of 151 Tremont Street, Boston. Raza at the time lived at 1 Park Lane in Boston's Seaport area. See Beylin Depo., 127.14-24 (Q. Did Ms. Raza visit your apartment on July 31st 2014? A. Yes. Q. At what address was your apartment at this time? A. Um, I believe it was 151 Tremont Street, apartment 27b. Q. At what address was -- was Ms. Raza's apartment at this time[?] A. At this time I believe it was in the Seaport, Park Lane, One Park Lane.)

**Plaintiff's Response:** Admitted.

22. Raza was pregnant as of July 31, 2014 with Beylin's child but Beylin and Raza had broken up as of July 31, 2014, and Beylin testified that, "the relationship was not romantic at that point." See Beylin Depo., 128.9-12 (Q: And had you and Ms. Raza broken up as of July 31st 2014? A: Yes, the relationship was not romantic at that point.)

    **Plaintiff's Response:** Admitted.

23. On July 31, 2014, Raza and Beylin had dinner and she stayed overnight at Beylin's apartment. See Beylin Depo., 129.16-20 (Q. Did you have dinner? A. We did have dinner. Q. And she stayed overnight with you, correct? A. She did, yes.)

    **Plaintiff's Response:** Admitted.

24. Raza remained in Beylin's apartment when he left for work the next morning on August 1, 2014. See Beylin Depo., 129.21-130.10 (Q. And you at some point left Ms. Raza alone in your apartment, correct? A. On the next -- Q. Yeah, the -- A. On August 1st? Q. Yes. Is that so? A. Uh-huh. Q. At what time did you leave? I think you testified earlier -- A. I think it was around 5:30. It was a typical routine. I was typically at work between 6 and 6:30 so I probably left the apartment usually 5:30. I'm sure that day was probably similar.)

    **Plaintiff's Response:** Admitted.

25. While in Beylin's apartment, Raza logged into the Fidelity network using her Fidelity-issued laptop so that she could send a work-related email. See Affidavit of Zanub Raza dated August 30, 2018, ¶5, at Dkt. 26, Attachment #1.

    **Plaintiff's Response:** Admitted

26. At some point on the morning of August 1, 2014, Raza left Beylin's apartment and at deposition testified that she might have stopped to get breakfast before she returned to her apartment. See Deposition of Zanub Raza ("Raza Depo."), 26.23-27.2 (Q: Okay. Do you recall what time you got to your apartment on the morning of August 1, 2014? A: I don't recall whether I stopped to get breakfast.)

**Plaintiff's Response:** Admitted, but in the light most favorable to the Plaintiff, the inference to be drawn is that she did not because she was in Beylin's apartment.

27. Documents produced by the ride-sharing service Uber show that Raza requested an Uber ride at 9:17 AM on August 1, 2014, that she was picked up at 9:22 AM, and that she arrived at her destination at 9:36 AM. See Samito Aff., Ex. 2.

    **Plaintiff's Response:** Admitted.

28. Trip details from her Uber account further show that she was picked up at 163 Tremont Street in Boston per her 9:17 AM request and that her destination was 1 Park Lane in Boston, which is where she lived as of August 1, 2014. See Raza Aff., Ex.1.

    **Plaintiff's Response:** Admitted.

29. A coffee shop called The Thinking Cup was and still is located at 165 Tremont Street in Boston. See Samito Aff., Ex.3.

    **Plaintiff's Response:** Denied. There is nothing in the record supporting the assertion that this coffee shop existed in 2014 or that this fact is material to summary judgment.

30. At 9:14 AM on August 1, 2014, various people received an email from rbeylin@gmail.com to which were attached the explicit photographs that Beylin had taken of himself on July 28, 2014 (the "Email"). As the Email is already in the Court record with the photographs having been filed under seal with the Court, see Dkt. No. 15-3, pp. 4-6 and Dkt. 23, Raza does not provide it again.

    **Plaintiff's Response:** Admitted.

31. The body of the Email was blank and did not identify the person in the photographs and no face or other identifying marks such as a tattoo is visible in any of the photographs. See photographs filed under seal with the Court.

    **Plaintiff's Response:** Admitted.

32. Some recipients were blind copied on the Email. See Beylin Depo., 164.2-6 (Q: So you're saying that some people were bcc'd, correct? A: So I don't

know. To this day, I don't have all the facts. But yes, I assume some people were bcc'd.)

**Plaintiff's Response:** Admitted.

33. Raza herself received the Email and first saw the explicit photographs Beylin had taken of himself when she opened it on August 1, 2014. Raza testified that she was "very shocked" because "Beylin and I never had the type of relationship where we would send these types of pictures" and she "never thought of Mr. Beylin to be the type of person to take or send pictures like these." See Raza Depo., 38.5-10 ("I -- I didn't know what to expect or what was going on, but later on, I opened my email and I saw the pictures, and I was very shocked. Because Mr. Beylin and I never had the type of relationship where we would send these types of pictures. So it was disconcerting."); 44.1-7 (Q: All right. And what did you do when you saw these pictures, what was your reaction? A: Disbelief. Q: Why do you say "disbelief"? A: Because I have never thought of Mr. Beylin to be the type of person to take or send pictures like these.)

**Plaintiff's Response:** Denied. <u>See</u> SMF, ¶¶ 8, 21, 25, 27, 30, 37, 88, 100-22, 139, which collectively give rise to the inference, taken in the light most favorable to the Plaintiff, that Raza sent the Explicit E-mail.

34. Beylin alleges that Raza used his iPad located in his apartment (the "iPad") to send the Email. See Complaint, Dkt. 1.

**Plaintiff's Response:** Admitted.

35. After learning about the Email, Beylin checked his rbeylin@gmail.com account and could not find the Email in its sent folder nor could he find it in its trash folder. See Beylin Depo., 136.20-137.3 (Q. And the e-mail at Exhibit 20 is no where to be found in your sent folder, in your rbeylin@gmail.com account, correct? A. Correct. Q. And it's no where to be found in the trash folder of your rbeylin@gmail.com account, correct? A. Correct.)

**Plaintiff's Response:** Admitted.

36. After learning about the Email, Beylin could not find the explicit photographs he had taken of himself on his iCloud account where he claims he had stored them. See Beylin Depo., 137.4-8 (Q. And the photographs that are attached to Exhibit 20, you testified earlier were deleted out of the iCloud, correct? A. I didn't see them on there, that's correct. Yep.)

**Plaintiff's Response:** Admitted.

37. Beylin alleges that Raza deleted from his iCloud account the sexually explicit photographs he had taken of himself and that Raza deleted the Email from his rbeylin@gmail.com account after she sent it. See Beylin Depo., 91.21-24 (Q. How did [the photographs] come not to be in your iCloud account? A: A. I believe that Ms. Raza deleted them after she sent them.); 92.8-10 ("She deleted the e-mail that she sent from my 'sent e-mail' folder so she covered her tracks.")

**Plaintiff's Response:** Admitted.

38. Beylin did not see Raza send the Email. See Beylin Depo., 120.3-7 (Q: You thought that you had been hacked, correct? A: I knew that Ms. Raza did it, yes, but -- Q: You didn't see her do it, correct? A: Correct. I was not at the apartment.)

**Plaintiff's Response:** Admitted, but <u>see also</u> SMF, ¶¶ 8, 21, 25, 27, 30, 37, 88, 100-22, 139, which collectively give rise to the inference, taken in the light most favorable to the Plaintiff, that Raza sent the Explicit E-mail.

39. Beylin did not see Raza delete the Email. Id.

**Plaintiff's Response:** Admitted, but <u>see also</u> SMF, ¶¶ 8, 21, 25, 27, 30, 37, 88, 100-22, 139, which collectively give rise to the inference, taken in the light most favorable to the Plaintiff, that Raza sent the Explicit E-mail.

40. Beylin did not see Raza delete from his iCloud account any of the sexually explicit photographs he had taken of himself. Id.

**Plaintiff's Response:** Admitted, but <u>see also</u> SMF, ¶¶ 8, 21, 25, 27, 30, 37, 88, 100-22, 139, which collectively give rise to the inference, taken in the light most favorable to the Plaintiff, that Raza sent the Explicit E-mail.

41. Raza unequivocally denies sending the Email. See Raza Depo., 39.18-23 (Q: Did you send those pictures? A: I did not. Q: You're sure? A: I'm absolutely positive. Q: No doubt in your mind? A: No.)

**Plaintiff's Response:** Admitted that Raza denies sending the E-mail. Denied that she did not send the explicit E-mail. <u>See</u> SMF, ¶¶ 8, 21, 25, 27, 30, 37, 88, 100-22, 139, which collectively give rise to the inference, taken in the light most favorable to the Plaintiff, that Raza sent the Explicit E-mail.

42. Raza unequivocally denies having any knowledge as to who sent the Email. See Raza Depo., 40.21-22 (Q: Okay. So you have no knowledge as to who sent them? A: I can only assume it was either [Beylin] or somebody else. I don't know.)

**Plaintiff's Response:** Admitted that Raza denies having knowledge of who sent the E-mail. Denied that she did not send the explicit E-mail. <u>See</u> SMF, ¶¶ 8, 21, 25, 27, 30, 37, 88, 100-22, 139, which collectively give rise to the inference, taken in the light most favorable to the Plaintiff, that Raza sent the Explicit E-mail.

43. Raza testified that upon learning about the pictures and upon first responding to Beylin's text to her accusing her of sending the Email, she felt "very hurt" and "very embarrassed" by his behavior, including feeling embarrassed for her unborn child. See Raza Depo., 47.2-48.10 (Q: What was your emotion at the time, were you -- were you happy that this had embarrassed Mr. Beylin? Mr. Samito: Just -- objection. At what time? Mr. Baker: When she was sending the text messages to Roman, after she had learned about the pictures. Mr. Samito: Okay. A: Happy? Absolutely not. Q: Well, then what was your feeling towards Mr. Beylin at that precise moment? A: I was very hurt. Q: I beg your pardon? A: I was very hurt. I was very embarrassed. Q: How were you embarrassed? A: I was embarrassed because, as I told you, I was pregnant. I was about four and a half, five months pregnant. Q: Okay. A: And it's very embarrassing to be in that situation. Q: So you were only thinking of yourself at that time, you were embarrassed? Mr. Samito: Objection. I was thinking of my child at the time. Q: Okay. But you weren't concerned about Roman at that moment? A: I was concerned about Mr. Beylin. Q: How so? A: I obviously still cared. Q: Cared about what? A: Cared about him.)

**Plaintiff's Response:** Admitted that Raza's testimony is accurately reproduced. The content is denied. <u>See</u> SMF, ¶¶ 8, 21, 25, 27, 30, 37, 88, 100-22, 139, which collectively give rise to the inference, taken in the light most favorable to the Plaintiff, that Raza sent the Explicit E-mail. Additionally, this is not a statement material to summary judgment.

44. As of August 1, 2014, Beylin began telling people that Raza sent the Email. See Samito Aff., Ex. 4.

**Plaintiff's Response:** Admitted. <u>See</u> SMF, ¶¶ 8, 21, 25, 27, 30, 37, 88, 100-22, 139, which collectively give rise to the inference, taken in the light most favorable to the Plaintiff, that Raza sent the Explicit E-mail.

45. As the body of the Email was blank and did not identify the person in the explicit photographs attached to it, and no face or other identifying marks are visible in any of the photographs, it was Beylin who revealed himself to be the person in the photographs attached to the Email. See Email and photographs filed under seal with the Court.

   **Plaintiff's Response:** Denied. This statement does not cite to anywhere in the record in support of this allegation.

46. On August 1, 2014, Beylin went to Boston Municipal Court to seek an abuse prevention order against Raza, testifying by affidavit that Raza sent the Email using his iPad. See Samito Aff., Ex. 5.

   **Plaintiff's Response:** Admitted.

47. The Boston Municipal Court scheduled a hearing on Beylin's petition for an abuse prevention order on August 11, 2014, and denied Beylin's petition. Id.

   **Plaintiff's Response:** Admitted, but this fact is not material to summary judgment.

48. Beylin testified at deposition that he also went to the Boston Police on August 1, 2014, concerning the Email though he never filed any police report. See Beylin Depo., 140.16-21 (Q. Did you contact the Boston Police? Did you contact the FBI? Who did -- that's different from the court system. A. So yeah, I did go into the police station. I went to the one on Sudbury Street.); 141.24-142.2 (Q. And you never filed a police report, correct? A. No, I never filed a police report.)

   **Plaintiff's Response:** Admitted.

49. Beylin never sought any possible footage taken on the morning of August 1, 2014, from security cameras in his building nor did he take any other steps to try to find out when Raza left his apartment that morning. See Beylin Depo., 139.4-12 (Q. All right. Did you ever ask to see footage taken on the morning of August 1st 2014 from any security cameras in the building in which you were living? A. No, I don't believe so. Q. In fact, you never tried to find out what time Ms. Raza left your apartment on August 1st 2014, correct? A. Um, correct.)

   **Plaintiff's Response:** Admitted.

50. On the morning of Monday, August 4, 2014, using his CLSA email address (roman.beylin@clsa.com), Beylin sent out to his clients an email that included, in part, the statement "Some of you may have received a spam e-mail from my personal Gmail account on Friday morning (around 9:30 am). My account was hacked and the e-mail was (obviously) not sent by me. Please let me know if you have any questions/concerns (I should have watched the video below about 2-years ago)." Right below that statement, Beylin's email included a link to a video called the "Hot Crazy Matrix – A Man's Guide to Women" which, as Beylin described it, "shows an exponential line; the hotter the girl, the crazier she is." See Samito Aff. Ex 6; Beylin Depo., 182.18-20.

    **Plaintiff's Response:** Admitted.

51. Beylin as of April 16, 2014, already was on a final written warning from CLSA. See Samito Aff., Ex. 7.

    **Plaintiff's Response:** Admitted, but this fact is not material to summary judgment.

52. According to a CLSA-produced document, "Upon a subsequent review of Mr. Beylin's emails, it became clear that Mr. Beylin was aware that several clients (including, but potentially not limited to Fidelity, Eaton Vance, Citigroup, MFS) received the emailed photograph, but in violation of CLSA's policies and procedures and Code of Conduct, Mr. Beylin never notified anyone at CLSA Americas of the incident." See Samito Aff., Ex. 8.

    **Plaintiff's Response:** Admitted, but this fact is not material to summary judgment.

53. According to this CLSA-produced document, "Because Mr. Beylin never brought up this issue [that several clients received the Email] to CLSA Americas so that the firm could attempt to do damage control, it was decided that his employment relationship with CLSA Americas needed to be terminated." See Samito Aff., Ex. 8.

    **Plaintiff's Response:** Admitted, but this fact is not material to summary judgment.

54. On August 13, 2014, Raza sent Beylin an e-mail stating, "Roman, I do not want to have to go to court and file something against you, but please do understand this clearly…I will pursue legal action against you if I keep getting approached by people claiming that you are blaming me for things that come out of your email account." See Samito Aff., Ex. 9.

**Plaintiff's Response:** Admitted.

55. On August 18, 2014, Raza sought and obtained from the Boston Municipal Court a ten day abuse prevention order against Beylin including an order that he not talk about her to any current or prospective employers and her supporting affidavit explicitly states that she seeks the order because of Beylin's misrepresentations that she sent the Email. See Raza Aff., Ex 2.

**Plaintiff's Response:** Admitted.

56. On August 28, 2014, the Boston Municipal Court held a two-party hearing on Raza's petition for an abuse prevention order against Beylin. Attorney Jonathan Plaut ("Plaut") represented Beylin at this hearing. Beylin had provided Plaut a $5,000 check on or around August 14, 2014. See Raza Aff., Ex. 2 and ¶ 4.

**Plaintiff's Response:** Admitted.

57. Fidelity ended Raza's employment effective September 5, 2014. See Raza Aff., ¶ 5.

**Plaintiff's Response:** Admitted.

58. On or about December 11, 2014, Raza initiated a Complaint in Suffolk County Probate Court pursuant to M.G.L. 209C to establish Beylin's paternity and his support obligations. See Samito Aff., Ex. 10. Beylin raised the Email during this case in which he was represented by counsel.

**Plaintiff's Response:** Admitted.

59. At deposition, Beylin could provide no factual evidence that Raza sent the Email. See Beylin Depo., 126.4-14 (Q: I'm going to ask again: what facts do you have that Ms. Raza sent the e-mail at Exhibit 20 on the morning of August 1st 2014? A: Ms. Raza was the only one at my apartment. Ms. Raza has a documented history of contact – accessing my electronic devices. Ms. Raza has a police report that says she assaulted me. There's a Fidelity investment. One of the largest financial companies in the world did an investigation and they determined Ms. Raza did it.); 159.15-17 ("Q: How are you positive that it was sent from the iPad? A: Because Ms. Raza did it."); 160.3-12 (Q: So how do you know it was sent from the iPad? A: Because it was Ms. Raza. She was with the iPad. Q: So you know it was sent from the iPad because Ms. Raza did it; that's your testimony? A: My testimony is that Ms. Raza was in my apartment alone with the iPad. The

iPad was the only one connected to the iCloud with the photos. Ms. Raza has a history of threatening me.)

**Plaintiff's Response:** Denied. Beylin's testimony lays out the circumstantial evidence. See also SMF, ¶¶ 8, 21, 25, 27, 30, 37, 88, 100-22, 139, which collectively give rise to the inference, taken in the light most favorable to the Plaintiff, that Raza sent the Explicit E-mail.

60. At deposition, Beylin could provide no factual evidence to rule out the concept that someone else sent the Email. See Beylin Depo., 123.23-124.8 (Q: What facts do you have to support that no one else could have sent the e-mail at Exhibit 20 [the Email]? A: She has a history of threatening me that's documented. She has a documented history of threatening me. There is a documented history -- Mr. Samito: He doesn't need to be reading from the Complaint, Jeff. That's bush-league.)

**Plaintiff's Response:** Denied. Beylin's testimony lays out the circumstantial evidence. See also SMF, ¶¶ 8, 21, 25, 27, 30, 37, 88, 100-22, 139, which collectively give rise to the inference, taken in the light most favorable to the Plaintiff, that Raza sent the Explicit E-mail.

61. Raza denies ever accessing Beylin's phone, iPad, or any other of Beylin's devices without his permission. See Raza Depo., 63.16-23 (Q: Ok. Did you ever access Mr. Beylin's phone without his permission? I did not. Q: Did you ever access his iPad without his permission? A: I did not. Q: Any other device? A: I did not.)

**Plaintiff's Response:** Admitted that this is Raza's testimony. Denied as to the content. She admitted that she accessed his phone without permission. SMF ¶ 101; see also SMF, ¶¶ 8, 21, 25, 27, 30, 37, 88, 100-22, 139, which collectively give rise to the inference, taken in the light most favorable to the Plaintiff, that Raza sent the Explicit E-mail.

62. Raza testified that Beylin losing his job would have hurt her child support claim and embarrassed her and her child. See Raza Depo. 260.3-8 (Q: Would Mr. Beylin losing his job have helped or hurt the child support claim you had on behalf of your child? A: It would have hurt it, and, additionally, it would have not only embarrassed me, it would have embarrassed the child.)

**Plaintiff's Response:** Admitted that this is Raza's testimony. Denied as to the content. See SMF, ¶¶ 8, 21, 25, 27, 30, 37, 88, 100-22, 139, which collectively give rise to the inference, taken in the light most favorable to the Plaintiff, that Raza sent the Explicit E-mail.

63. Despite alleging that Raza was volatile and unstable and had accessed his iPhone and iPad without authorization throughout their relationship, Beylin could offer no explanation as to why he left her alone in his apartment on August 1, 2014, and with the iPad. See Beylin Depo., 149.21-150.15; 150.15-22 (Q: So again, if that statement is true, why did you leave Ms. Raza alone in your apartment on August 1st 2014 with your iPad? A: I left her alone. Q: Why did you leave her alone with the iPad? A: I had to go to work. Um, I left her alone.)

**Plaintiff's Response:** Denied. The quoted testimony establishes that Beylin left her there because he "had to go to work." See also SMF ¶ 99.

64. Despite claiming that both his iPad and his rbeylin@gmail.com account had been accessed by Raza without authorization on August 1, 2014, Beylin does not recall changing his iPad password on August 1, 2014, or thereafter, nor does he recall changing the password to his rbeylin@gmail.com account on August 1, 2014, or thereafter. See Beylin Depo., 86.14-16 (Q. When did you first change your iPad password after August 1st 2014? A. I don't recall.); 87.9-14 (Q. Did you change your rbeylin@gmail.com password on August 1st 2014? A. I don't recall. Q. When did you first change your rbeylin@gmail.com password after August 1st 2014? A. I don't recall.); 119.21-23 (Q. Did you change the [iPad] password after this return to your apartment? A. No.)

**Plaintiff's Response:** Admitted.

65. When asked at deposition, "And you testified that Ms. Raza had exhibited stalking behavior through your relationship?" Beylin testified, "Yes" See Beylin Depo., 201.21-24. Nonetheless, Beylin at some point after August 1, 2014, moved into One Longfellow Place in the West End Apartments with a new girlfriend, Michelle Janer, who is now his wife. Ms. Raza lived at One Emerson Place in the West End Apartments at the time Beylin moved to One Longfellow Place. Beylin and Raza still live at these respective addresses. See Beylin Depo., 199.13-14 ("And then moved to One Longfellow Place."); 201.16-20 (Q. And did you move into the new apartment with Michelle Janer? A. I did. Q. And that's now your wife, correct? A. That's correct.). See Raza Aff., ¶ 6.

**Plaintiff's Response:** Admitted, but this fact is not material to summary judgment.

66. According to Google Maps, One Longfellow Place and One Emerson place are .4 miles apart. See Samito Aff., Ex. 11.

**Plaintiff's Response:** Admitted, but this fact is not material to summary judgment.

67. Beylin obtained a minor in information technology in college. See Beylin Depo., 105.6-8 (Q. Do you have a minor in information technology? A. I believe it was a minor, yeah.)

    **Plaintiff's Response:** Admitted.

68. Beylin admits that, at some point after August 1, 2014, he deliberately reset the iPad that he claims was used to send the Email. See Beylin Depo., 81.6-12 (Q: Did you ever come to know that the iPad had been reset either by you or somebody else? A: Yes, I believe I did reset the iPad. Q: When did you reset the iPad? A: I don't remember the exact date. I believe I did it maybe 2014, maybe 2015. I don't recall."); 82.3-7 (Q: This was after the sending of the email on August 1st 2014, correct? A: I believe this was after August 2014, yes. Yes.")

    **Plaintiff's Response:** Admitted that the iPad was reset in 2014 or 2015. Denied as to the remainder and the characterization. SMF ¶¶ 137, 141-47, 149.

69. On May 24, 2018, Beylin's counsel, Jeffrey Baker ("Baker"), certified to the Bankruptcy Court that he counseled Beylin to preserve evidence. See Dkt. 11.

    **Plaintiff's Response:** Admitted, but this fact is immaterial to summary judgment.

70. On June 21, 2018, Raza's counsel conferred with Baker telephonically and expressed a desire to have a forensic analysis performed on the iPad. This conversation is memorialized in the Rule 26(f) discovery plan filed by Baker on June 26, 2018. See Dkt. 13.

    **Plaintiff's Response:** Admitted, but this fact is immaterial to summary judgment.

71. In August 2018, Beylin moved for summary judgment without having yet produced the iPad to Raza for analysis. In opposing his motion, Raza raised the possibility that Beylin had committed spoliation of the iPad. See Dkt. 25, p. 8 ("By his refusal to produce the iPad, however, it seems that in actuality Mr. Beylin either committed spoliation or otherwise knows that forensic examination of the iPad will eliminate his claims.")

**Plaintiff's Response:** Admitted, but this fact is immaterial to summary judgment.

72. Beylin finally made the iPad available to Raza's expert for analysis on November 8, 2018. See Samito Aff., Ex. 12.

    **Plaintiff's Response:** Admitted, but this fact is immaterial to summary judgment.

73. The first time any of Beylin or his counsel revealed to Raza or her counsel that Beylin had previously reset the iPad was when he testified about doing so at his deposition on March 6, 2019. See Paragraph 68 above for this deposition testimony.

    **Plaintiff's Response:** Admitted, but this fact is immaterial to summary judgment.

74. On July 28, 2017, Beylin filed suit against Raza concerning the Email in Suffolk County Superior Court, Beylin v. Raza, Civil Action No. 1784CV02373 (the "Superior Court Action"), with Baker as his counsel as of that date. See Samito Aff., Ex. 13.

    **Plaintiff's Response:** Admitted, but this fact is immaterial to summary judgment.

75. On October 5, 2017, Raza served her Answer and Counterclaim in the Superior Court Action. See Samito Aff. Ex. 13 and Ex. 14.

    **Plaintiff's Response:** Admitted, but this fact is immaterial to summary judgment.

76. While there is no indicator as to the exact date(s) Beylin reset the iPad, Raza's expert confirmed a number of timestamps that indicate that a restoration of the iPad took place on October 8, 2017. Beylin's putative expert, Peter Kohler of Evidox Corporation ("Kohler"), does not dispute this finding and himself believes a reset took place on October 8, 2017. See Affidavit of Alfred Demirjean ("Demirjean Aff."), ¶ 6; Samito Aff., Ex. 15A, ¶ 9.

    **Plaintiff's Response:** Admitted that "there is no indicator as to the exact date(s) Beylin reset the iPad." Admitted that the iPad timestamp identified by Raza's expert indicates that "a restoration of the iPad took place on October 8, 2017." Denied that Kohler "believes a reset took place on October 8, 2017. Aff. Kohler, ¶¶ 5-6; see also SMF, ¶¶ 136.

77. Had the iPad been used to send the Email, the iPad would have retained evidence of such use if it had not been reset. Beylin's resetting of the iPad completely eliminated such evidence and prevents any ability to analyze whether the iPad was the device used to send the Email. See Demirjean Aff., ¶ 7.

**Plaintiff's Response:** Denied. See SMF, ¶¶ 132-33, 135-36.

78. After searching Beylin's Gmail account, rbeylin@gmail.com, Raza's expert found no evidence of the Email in the account nor any evidence that the Email was deleted from that account. See Demirjean Aff., ¶ 4.

**Plaintiff's Response:** Admitted that this is what Raza's expert concluded; but see SMF, ¶¶ 37, 114.

79. After searching Beylin's iCloud account, Raza's expert found no evidence that any of the photographs attached to the Email were stored in that account nor any evidence that any of the photographs were deleted from that account. See Demirjean Aff., ¶ 5.

**Plaintiff's Response:** Admitted that this is what Raza's expert concluded; but see SMF, ¶¶ 37, 114.

80. Kohler stated in Paragraph 76 of his initial report that "Only local data on the [iPad] is affected by a res[e]t[.]" Kohler stated in Paragraph 10 of his rebuttal report, "I agree that resetting the iPad makes any prior data on the local device unrecoverable." See Samito Aff., Ex. 15, ¶ 76; Ex. 15A, ¶ 10.

**Plaintiff's Response:** Admitted, but see SMF, ¶¶ 132-33, 135-36.

81. The "local data" Kohler referenced in Paragraph 76 of his initial report includes the local data that would show whether the iPad was the specific device used to send the Email. This "local data" was deleted from the iPad when Beylin performed a reset on it and it is not recoverable. Artifacts in this "local data" would have existed showing whether this specific iPad had been used to send the Email on the morning of August 1, 2014, even if the Email had been deleted from Beylin's Gmail account after it was sent. Beylin's reset of the iPad erased any artifacts that could have been analyzed to determine whether it was the specific device used to send the Email. It is possible the iPad would have contained additional evidence relevant to this case but there is no way to know because Beylin erased the "local data" on it. See Demirjean Aff., ¶ 8; Samito Aff., Ex. 15A, ¶ 10..

**Plaintiff's Response:** Denied. See SMF, ¶¶ 132-33, 135-36.

82. Kohler concludes, in ¶ 81 of his initial report, "notwithstanding the factory reset of the iPad, no information was lost. Mr. Beylin took reasonable steps to preserve the information because it was synched with hits [sic] iCloud account that backups the data." Paragraph 81 of Kohler's initial report contradicts ¶ 76 of his initial report which admits that "local data on the [iPad] is affected by a res[e]t" and it contradicts ¶ 10 of his rebuttal report that "I agree that resetting the iPad makes any prior data on the local device unrecoverable." See Samito Aff., Ex. 15, ¶¶76 and 81; Ex. 15A, ¶ 10.

**Plaintiff's Response:** Denied. The statements do not conflict; the relevant information was stored in other locations. See SMF, ¶¶ 132-33, 135-36.

83. Before or at the time he wrote ¶ 81 of his initial report, Kohler did not have access to the iPad nor did he perform any analysis on it. In writing his initial report, Kohler did not perform any analysis on Beylin's Gmail and/or iCloud accounts. While claiming in ¶ 3 of his rebuttal report that he relied on material from Beylin's Gmail and iCloud accounts for his initial report, Kohler states in ¶ 15 of his rebuttal report that the Email and images are not to be found in those accounts. According to the statement of materials reviewed that is attached to Kohler's initial report, Kohler did not access any of the iPad, Gmail account, and iCloud account. See Samito Aff., Ex. 15 (including p. 29 (list of specific materials Kohler reviewed)) and Ex. 15A.

**Plaintiff's Response:** Denied. The expert viewed the cloud accounts. [Document 92-3, Exhibit 15A, pp. 1-2, 6].

84. Beylin has not produced any information recovered from the iPad. Samito Aff., ¶ 18.

**Plaintiff's Response:** Denied. See SMF, ¶¶ 132-33, 135-36.

85. Beylin has not produced any information from his "iCloud account that backups the data" as referenced by Kohler in ¶ 81 of his report, nor has he produced a forensic mirror image of the iPad made and preserved before he reset the device. Samito Aff., ¶ 18.

**Plaintiff's Response:** Denied. See SMF, ¶¶ 132-33, 135-36.

86. Nowhere does Kohler show that iPad was used to send the Email. See the entirety of Samito Aff., Ex. 15, Ex. 15A.

**Plaintiff's Response:** Denied. <u>See</u> SMF, ¶¶ 8, 21, 25, 27, 30, 37, 88, 100-22, 139; [Document 92-3, Exhibit 15]; [Document 92-3, Exhibit 15A], which collectively give rise to the inference, taken in the light most favorable to the Plaintiff, that Raza sent the Explicit E-mail.

87. Fidelity never had access to the iPad nor did it perform any analysis on it. See no mention of it in Fidelity documents at Samito Aff., Ex. 15, pp. 42-49; 57-59; Demirjean Aff., Ex. 1, Addendum.

**Plaintiff's Response:** Admitted, but this fact is immaterial to summary judgment.

88. Fidelity-produced documents show that Raza connected to the Fidelity network on August 1, 2014, using her Fidelity-issued laptop from 7:57:49 AM to 9:32:39 AM from IP address 24.218.7.146. See Id.

**Plaintiff's Response:** Admitted.

89. Metadata for the Email also includes the IP address 24.218.7.146. See Id.

**Plaintiff's Response:** Admitted.

90. Because the IP address 24.218.7.146 appeared on Raza's login credentials as well as on the Email, Fidelity concluded that she must have been responsible for sending the Email. Fidelity did confirm that the Email was not sent from Raza's Fidelity- owned laptop. See Id. and Demirjean Aff., Addendum to Exhibit 1, FID09213 ("There was no evidence to indicate the employee's Fidelity issued laptop was used to obtain, store or communicate the images referenced in the e-mail, nor was any evidence of connectivity to gmail found.")

**Plaintiff's Response:** Denied, the Fidelity report is extensive; <u>see also</u> SMF, ¶¶ 8, 21, 25, 27, 30, 37, 88, 100-22, 139.

91. Kohler concludes that Raza sent the Email because, to quote ¶ 80 of his report at Samito Aff., Ex. 15: It is likely Ms. Raza knew the password/PIN code to Mr. Beylin's iPad and no additional information was required to unlock the device. On the morning of August 1, 2013 Ms. Raza was alone at Mr. Beylin's apartment with access to the iPad. The Explicit Images and Mr. Beylin's email account were both accessible through the iPad. The Fidelity ERA Logs clearly show Ms. Raza connected to the Fidelity network from IP address 24.218.7.146 on August 1, 2014, from 7:57 am to 09:32 am. The email header from the Explicit Email show it originated from IP address 24.218.7.146 on August 1, 2014 at 9:14 am

**Plaintiff's Response:** Admitted.

92. Nowhere does Beylin proffer any evidence to identify what 24.218.7.146 signifies. See absence of any such evidence at Samito Aff., Ex. 15 or anywhere else.

    **Plaintiff's Response:** Denied. <u>See</u> SMF, ¶¶ 88, 105-09, 122, 124, which collectively give rise to the inference that this IP address was Beylin' home network.

93. 24.218.7.146 was a global, not device-specific, IP address, as confirmed because it appears on Raza's Fidelity account login via her laptop as well as the Email which was sent from an iPad. See Demirjean Aff., ¶ 9.

    **Plaintiff's Response:** Admitted, but <u>see also</u> SMF, ¶¶ 88, 105-09, 122, 124, which collectively give rise to the inference that this IP address was Beylin' home network.

94. As a global IP address, 24.218.7.146 could apply to an unknown number of different devices connected to a network of unknown size covering a geographic area of indeterminate magnitude. All that is known is that 24.218.7.146 signifies a global IP address relevant to an unspecified area that happened to include Beylin's apartment. See Demirjean Aff., ¶ 10.

    **Plaintiff's Response:** Denied. <u>See</u> SMF, ¶¶ 88, 105-09, 122, 124, which collectively give rise to the inference that this IP address was Beylin' home network.

95. There is no evidence as to the number of users, how many different people have the ability to log into this network at any time, the number of devices used by these users, or even the geographic area covered by this global IP address, 24.218.7.146. Kohler agrees. See Demirjean Aff., ¶ 11; Samito Aff., Ex. 15A, ¶ 30 (Kohler's rebuttal report ("Mr. Demirjean is correct when he asserts that the IP address 24.218.7.146 alone signifies a Global IP address and there is no direct evidence as to the number of users or geographic area covered."))

    **Plaintiff's Response:** Denied. <u>See</u> SMF, ¶¶ 88, 105-09, 122, 124, which collectively give rise to the inference that this IP address was Beylin' home network.

96. The existence of this global IP address, 24.218.7.146, on Raza's Fidelity account activity and the Email's metadata is inconclusive. In the absence of evidence from the iPad, Kohler relies solely on the existence of a global

IP address (24.218.7.146) on Raza's Fidelity login materials as well as the metadata of the Email to conclude that Raza sent the Email. See Demirjean Aff., ¶ 13.

**Plaintiff's Response:** Denied. See SMF, ¶¶ 88, 105-09, 122, 124, which collectively give rise to the inference that this IP address was Beylin' home network.

97. Had Beylin not reset the iPad, examining it would have been conclusive at least as to establishing whether it was the specific device used to send the Email. See Demirjean Aff., ¶ 12.

**Plaintiff's Response:** Denied. See SMF, ¶¶ 132-33, 135-36.

98. On May 25, 2019, Raza's counsel sent an email to Beylin's counsel calling attention to Beylin's spoliation of the iPad, lack of evidence, and inability to meet his burden of proof. In this email, Raza's counsel put Beylin's counsel on notice that Raza would seek sanctions for spoliation as well as the frivolous, improper, and bad faith nature of Beylin's claims See Samito Aff., Ex. 16.

**Plaintiff's Response:** Admitted that the E-mail was sent, but this is not a fact material to summary judgment. The Plaintiff responded to this E-mail several days later by E-mail and certified mail explaining the position of the Plaintiff and his counsel. Aff. Groulx, ¶¶ 9-10, Exhibit 2 (Jul. 26, 2019).

## Plaintiff's Supplemental Statements of Material Facts

99. While she was pregnant, Beylin assisted Raza with doctor's appointments and other aspects of her pregnancy. Beylin Depo., 152:9-14 ("It was spending time with her as much as I could. I would make dinner if she stayed over. I would go to CVS. I think she needed some bandages at one point or another, so I would pick those up. Whatever she needed as much as I could do, I would help her out.").

100. Raza assaulted Beylin on July 21, 2014. Beylin Depo., 70:15-71:21 ("Q. Okay. Is there anything you want to add about Ms. Raza's volatile behavior as a result of seeing this paragraph that you haven't already testified? A. Um, on July 22nd or maybe it was July 21st, Ms. Raza sent an e-mail to all of our -- all of my contacts and I don't know who else saying this I'm -- accusing me of cheating on her, telling everyone to pick a side. Then in the afternoon of July 21st Ms. Raza first exhibited a stalking behavior where she unannounced, followed me from work to a grocery store, Avery Provisions, at which point she wanted to talk. I was supposed to go home

and meet a friend. I told her I did not want or was able to talk to her at that time. As I started walking home from Avery Provisions, Ms. Raza followed me. On Tremont Street Ms. Raza physically assaulted me. She grabbed -- grabbed my arm, grabbed my pants, ripped my pants, ripped some clothing. I threatened to call the police. Ms. Raza didn't stop. I did call the police. When Ms. Raza actually realized that I was actually talking to police and that I had called 911, Ms. Raza ran away. Um, the police came. I gave them my -- what happened. They asked if I wanted to press charges. Um, I thought about it. At that time I did not want to get Ms. Raza in trouble with the law legally, so I decided against that.").

101.    Raza accessed Beylin's cellphone and looked at his activities. Beylin Depo., 26:11-20 (Q. Describe for me the incident where Ms. Raza allegedly accessed your cell phone. A. At the time I was -- I believe it was the morning after we had arrived, so it was before us leaving, going back home. I was in the shower and when I had come out of the shower Ms. Raza confronts me about me being on dating apps, her looking at my phone and seeing various dating apps on there and she becomes upset.").

102.    Raza had used Beylin's passcode to access his cellphone after she had seen him enter it. Beylin Depo., 28:4-24 ("Q. Was your cell phone password protected at the time? A. I -- probably, most likely. Q. But you don't recall if it was password protected at the time? A. I believe it was. I believe it was in 2014, '13, yep. Q. When was this? Was this 2014 or was this earlier, the Foxwoods incident? A. We started dating around late 2012, 2013, 14 so it would be around that time. I don't remember the exact date. Q. How would Ms. Raza have had your password to access the cell phone? A. I had been spending a good amount of time with Ms. Raza. My password is four digits. You enter it multiple times. It's not hard to -- Q. So you're saying she just got a lucky guess? A. No, she had seen me enter the password on multiple occasions.").

103.    Raza has admitted to accessing Beylin's phone. Exhibit A, FID04318 ("i am sorry i went through ur phone last night and caused such drama"); Exhibit A, FID04359 ("i went through ALL ur messages").

104.    The Explicit Photographs that Beylin took of himself were stored in his iCloud account, which automatically synched with his iPad. [Document 92-3, Exhibit 15, pp. 4, 22, 24].

105.    Beylin's internet provider on August 1, 2014, was Comcast. Aff. Raza, p. 158:17 ("I mean, Roman had Comcast."); Aff. Beylin, ¶ 2.

106.    Raza had the credentials to access to Beylin's home network and connected to it with her devices, including her Fidelity-issued laptop. Aff. Beylin, ¶ 3.

107.    Fidelity logged Beylin's father's access of the Fidelity network from the IP address 24.2187.146 in April 2014. Exhibit A, FID09213.

108.    Beylin logged into Fidelity's network from the IP address 24.2187.146 in 2014. Exhibit A, FID09213.

109.    Beylin accessed Fidelity's network on that day from his home. Exhibit A, FID09213; Aff. Beylin, ¶ 4.

110.    While on the Fidelity network, at 8:44 a.m., Raza used her Gmail account (zanub.raza@gmail.com) to send an e-mail containing a JPG file of a photo of corn on a grill to her Fidelity E-mail account (zanub.raza@fmr.com). Exhibit A, FID08876-77.

111.    She then deleted the E-mail from her Fidelity account and then deleted the E-mail from the deleted items folder. Exhibit A, FID08876-77.

112.    Fidelity concluded that Raza did this to know what it would look like for her to receive an e-mail containing a JPG file. Exhibit A, FID FID08876-77.

113.    The metadata of the Explicit E-mail shows that it was sent using the iPad Mail application. [Document 92-3, Exhibit 15, p. 19].

114.    The fact that the Explicit E-mail and Explicit Photographs were no longer accessible on the iPad is consistent with Beylin's assertion that Raza deleted them. [Document 92-3, Exhibit 15, p. 24] ("To the extent that the information cannot be restored or replaced, it is consistent with the assertion that Ms. Raza deleted the Explicit Email and Explicit Images from Mr. Beylin's cloud accounts.").

115.    Before Raza left Beylin's apartment, she closed her laptop. Raza Depo., p. 160:13-16. ("Q. Okay. So you logged on at Roman's house, you did some work for Fidelity, and then you logged off? A. Or closed my laptop, either one of them.").

116.    The intersection where Raza was picked up by the Uber on the morning of August 1, 2014, is 115 feet from Beylin's apartment. [Document 92-3, Exhibit 15, p. 33].

117.    Beylin did not learn that the Explicit E-mail had been sent until approximately 9:31 a.m. when a colleague instant messaged him. Aff. Beylin, ¶¶ 5-6.

118.    On August 1, 2014, at 9:33 a.m., Beylin texted Raza, asking "What did you do?????!!!!!!!! HOLY FUCK. HOLY FUCK." Aff. Beylin, ¶ 7.

119.    In response to Beylin's text, Raza responded: "Ohh…Wow… well hope all your lies and cheating were worth it. I would like to continue forward legally. Please stay away from both me and the kid going forth [sic]. Bye". Aff. Beylin, ¶ 7.

120.    Raza did not deny sending the explicit E-mail in her response to Beylin. Aff. Beylin, ¶ 7.

121.    Beylin was humiliated by the Explicit E-mail and contemplated suicide. Beylin Depo. p 203:2-16 ("2 Q. What harm did Ms. Raza cause you? A. I mean, I think first of all, obviously a lot of emotional harm, psychological harm, loss of friends, loss of contacts, loss of professional relationships. I got fired from my job. Um, I lost future income. I got basically, you know, kicked out of the industry. I -- you know, I couldn't sleep. I had suicidal thoughts. I had to seek help, had to talk to a Rabbi, had to seek help from kind of a spiritual advisor to help me deal with the situation. You know, feelings of just letting my family down with what happened, and just -- just a lot of -- a lot of feelings of failure.").

122.    Raza did not deny that she was on Beylin's network the morning of August 1, 2014, also testified that she "logged in [using her Fidelity laptop] in the morning, probably at Roman's house" and "probably did" work while in his apartment. Raza Depo., 160:7-16 ("A. Mr. Baker, I – I logged in in the morning, probably at Roman's house, and that was it, and I probably did log off. So I – I – I wasn't – you know, I mean, this is how I – I close my computer, and that's pretty much all I do, so… Q. Okay. So you logged on at Roman's house, you did some work for Fidelity, and then you logged off? A. Or closed my laptop, either of them.").

123.    Beylin's expert opined that Raza's expert "report fails to consider the factual context of this litigation. It is important for computer forensic analysts to review digital evidence against known events. Failing to do so undermines [the expert's] conclusions." [Document 92-3, Exhibit 15A, p. 1].

124. The IP address 24.218.7.146 is a Comcast address. [Document 92-3, Exhibit 15, p. 47] ("Public records indicate 24.218.7.146 is a Comcast address.").

125. The only iPad in Beylin's apartment on the morning of August 1, 2014, was his own. Aff. Beylin, ¶ 8.

126. Raza's expert opines that "Fidelity was working from incorrect assumptions. Fidelity believed Ms. Raza was at her home the entire time. This was not true." [Document 92-5, Exhibit 1, p. 5].

127. Fidelity believed that Raza was at her home because she told them that she was. Exhibit A, FID08877 ("Raza also provided the following during the interview [with Fidelity personnel]: … On 8/1/2014 Raza was working from home. She was alone that day; her roommate was not home, no friends were visiting, and Beylin was not in her home.") This was a lie. Raza Depo., 160:7-16 ("A. Mr. Baker, I – I logged in in the morning, probably at Roman's house, and that was it, and I probably did log off. So I – I – I wasn't – you know, I mean, this is how I – I close my computer, and that's pretty much all I do, so… Q. Okay. So you logged on at Roman's house, you did some work for Fidelity, and then you logged off? A. Or closed my laptop, either of them.").

128. On July 15, 2014, Raza sent Beylin an E-mail stating in part:

> In addition, please make sure you are prepared with a lawyer by Thursday. I gave u the option, to work this out, be honest and not lie to me, but clearly, only decent people can take those options and only decent people can be honest and not continue to lie to another person's face.
>
> I will let everyone know the type of sleaze bag you are, and how u cheated on your pregnant girlfriend .. and left .. Would love to see what everyone has to say about that. Good luck with your "relationship building" as I don't think anyone in this town would likely be sympathetic to a sleaze bag like u.

Exhibit A, FID08916.

129. There is no evidence in the record that Raza was at the Thinking Cup or any other establishment the morning of August 1, 2014.

130.    On July 21, 2014, Raza sent an E-mail to many of their acquaintances stating that Beylin "has cheated on me multiple times," that Beylin "is telling me that he doesn't want to pay child support," and that Beylin "is a completely immoral individual" who "constantly lies." Exhibit A, FID08918.

131.    On July 22, 2014, Raza told Beylin that "Please be advised, the delivery date has been moved up to the week of October 30. Make sure you are legally & financially prepared." Exhibit A, FID08924.

132.    The metadata of the Explicit E-mail is available. [Document 92-3, Exhibit 15, p. 19].

133.    Raza's expert stated that "On February 12, 2019, Ms. Raza provided us with a forensically sound copy of the Email as she received it on August 1, 2014." [Document 92-5, Exhibit 1, p. 2].

134.    Raza's expert opines that the reset of the iPad deleted "any data that could show whether the original Email was sent from or ever located on the iPad." [Document 92-5, Exhibit 1, p. 5].

135.    Raza's expert does not describe specifically what information might have been on the iPad that could be used to determine whether the Explicit E-mail was sent from that device. See [Document 92-5, Exhibit 1], generally.

136.    There would likely have been no data on the iPad that could have been used to determine whether the explicit E-mail was sent from that device. [Document 92-3, Exhibit 15A, p. 1] ("Assuming that … a cached copy of the Explicit Email existed on Mr. Beylin's iPad in August of 2014, I would not expect that evidence to be retained indefinitely. I would not expect that cached copy to survive for four years."); [Document 92-3, Exhibit 15A, p. 1] ("given the length of time between the sending of the Explicit Email and the analysis of the iCloud account, it is not surprising there is no evidence of deletions. That is, I would not expect evidence of deletion to survive for four years.").

137.    Beylin did not intentionally delete any relevant ESI. Aff. Beylin, ¶ 11.

138.    Deleting the Explicit Images from Beylin's iCloud account would also delete the images from his iPhone. [Document 92-3, Exhibit 15, p. 23].

139.    When Beylin arrived home on the morning of August 1, 2014, his iPad was in a different place from where he had left it. Beylin Depo., 135:8-12

("Q. What did you do when you arrived at your apartment? A. When I arrived at the apartment, um, I -- well, the first thing I saw was the iPad was in a different place, um, than when I left it.").

140.    In resetting the iPad in 2014, Beylin did not know that there would be data other than the Explicit E-mail, photographs, and data stored in the Gmail and iCloud back-ends that might be relevant in future litigation. Aff. Beylin, ¶ 12.

141.    Beylin did not know that any relevant information would not have been also stored in the cloud. Aff. Beylin, ¶ 13; Beylin Depo., p. 81:18-22 (Q. And that wiped all the data off it, didn't it? A. Um, I don't believe there was any data actually stored on the iPad. Everything is, I think, stored on kind of the iCloud or –").

142.    Beylin is not familiar with how Apple's iOS operating system manages data. Aff. Beylin, ¶ 14.

143.    Beylin believed that the photographs and Explicit E-mail were preserved because they had been sent to so many people. Aff. Beylin, ¶ 15.

144.    Beylin took reasonable steps to preserve the relevant ESI because it was synched with hits iCloud account that backups the data. [Document 92-3, Exhibit 15, p. 24] ("Mr. Beylin took reasonable steps to preserve the information because it was synched with hits iCloud account that backups the data.").

145.    Beylin's expert requested and received a copy of Raza's copy of the Explicit E-mail and was able to extract substantially the same metadata from it. [Document 92-3, Exhibit 15A, p. 2].

146.    The resetting of the iPad does not preclude an analysis of the other available sources of evidence, nor does it preclude a finding that the Explicit Email was sent using Mr. Beylin's iPad. [Document 92-3, Exhibit 15A, p. 4].

147.    Resetting an iPad does not affect the data saved in cloud accounts. [Document 92-3, Exhibit 15, p. 5] ("resetting the iPad does not impact data saved in cloud accounts…. [R]esetting the iPad impacts the local data on the device only, but the primary evidence, the Explicit Email and the Explicit Images, are unaffected by the reset.").

148.     There is no evidence in the record that Raza's expert analyzed the iPad image or drafted any portion of his report until after Beylin's March 6, 2019, deposition.

149.     Beylin did not perform a reset of the iPad on October 8, 2017, nor at any time in 2017 or after. Aff. Beylin, ¶ 11.

150.     The iPad was not at issue in the probate court litigation. See [Document 15-6], generally.

151.     Raza argued in the Probate Court that it was Beylin who sent the Explicit E-mail. [Document 15-6], p. 2.

152.     Fidelity's conclusion is backed by a thorough review of the relevant facts. Exhibit A, FID08615-17, FID8872-933.

153.     Raza's expert opines that "there is no indicator as to the exact date(s) for any resetting of the iPad." [Document 92-5, Exhibit 1, p. 3].

154.     Raza's expert cannot conclude that Beylin reset the iPad at any time. [Document 92-5, Exhibit 1, p. 3].

155.     Raza's expert conflates the ideas of "resetting" and "restoring" an iPad. Aff. Kohler, ¶ 7.

156.     A "reset" of an iPad device is the event that erases the local data on the iPad. Aff. Kohler, ¶ 8.

157.     A "restore" of an iPad device is the execution of the "Setup.app" application when a user inputs their initial settings. Aff. Kohler, ¶ 9.

158.     When the Setup.app is executed, the date of the restore is logged in the metadata that Raza's expert reviewed. Aff. Kohler, ¶ 10.

159.     A restore of an iPad may occur at any time after a reset. Aff. Kohler, ¶ 11.

160.     It is consistent with the facts that Beylin performed a factory reset of the iPad before 2017 and then ran the Setup.app October 8, 2017. Aff. Kohler, ¶ 12.

161.     In July 2017, it was made clear to Beylin by counsel that documentary evidence and the iPad had to be preserved for the superior court litigation. Aff. Beylin, ¶ 16.

162.    Beylin flew to Las Vegas for his bachelor party on October 10, 2017. Aff. Beylin, ¶ 17.

163.    iOS version 11.0 was released September 19, 2017, and version 11.0.2 was released October 3, 2017. Aff. Beylin, ¶ 20.

164.    Prior to taking the flight, on October 8, 2017, Beylin turned on the iPad and ran the "Setup.app" routine. Aff. Beylin, ¶ 18.

165.    Beylin turned on the iPad on October 8, 2017, because he was going to download movies to watch on the flight. Aff. Beylin, ¶ 19.

166.    The probate court issued its ruling in the paternity matter on March 21, 2016. [Document 15-6].

167.    Raza's expert opines that "there is no evidence of the presence of the Email on Mr. Beylin's Gmail account…." [Document 92-5, Exhibit 1, p. 5].

168.    Raza's expert opines that "While there were over 4600 photographs present in Mr. Beylin's iCloud account at the time Techfusion accessed it, none of the images attached to the Email were present in the account nor was there any evidence that any of the images had been deleted." [Document 92-5, Exhibit 1, p. 6].

169.    According to its website, as of March 31, 2018, Fidelity managed $6,854.4 billion in assets. Aff. Beylin, ¶ 9.

Respectfully submitted,

ROMAN BEYLIN,

by his attorneys,

/s/ Patrick M. Groulx
Patrick M. Groulx
BBO No. 673394
Isenberg Groulx, LLC
368 W Broadway, Suite 2
Boston, MA 02127
Ph: (857) 880-7889
Fax: (617) 249-1981
E-mail: patrick@i-gllc.com

/s/ Jeffrey S. Baker
Jeffrey S. Baker, Esq.
BBO No. 544929
Baker & Assoc.
Two West Hill Place, Suite 100
Boston, MA 02114
Ph: (617) 573-9505
E-mail: bakerlaw@aol.com

Date: July 26, 2019